DISCIPLINARY ACTION
 

 PER curiam:.
 

 The Respondent, Joel C. Levy, was charged in a single count Verified Complaint for Disciplinary Action with engaging in professional misconduct in connection with his handling of the estate of one Ethel L. Parzen during the period of 1981 through 1987. Pursuant to Admission and Discipline Rule 23, this court appointed the Honorable Mary R. Harper as hearing officer who heard the case and presented her report. This court recognizes her excellent efforts in presiding over the hearing and appreciates the quality of her report.
 

 The ease is now before us for review upon the Commission’s Petition for Review, the Respondent’s Response and the Commission’s Reply. At issue are the findings regarding mitigation due to Respondent’s injuries sustained in an automobile accident and the hearing officer’s conclusion as to Respondent’s fitness to practice law. In reviewing attorney discipline cases, this court reviews
 
 de novo
 
 all matters presented. This includes review not only of the hearing officer’s report but also of the entire record tendered in the case. The hearing officer’s findings receive emphasis due to the unique
 
 *792
 
 opportunity for direct observation of witnesses, but this court remains the ultimate fact finder and arbiter of misconduct and sanction.
 
 Matter of Geisler
 
 (1993), Ind., 614 N.E.2d 939;
 
 Matter of Smith
 
 (1991), Ind., 579 N.E.2d 450;
 
 Matter of Gemmer
 
 (1991), Ind., 566 N.E.2d 528. The Commission’s challenges to the findings and conclusion will be addressed within the framework of such
 
 de novo
 
 review.
 

 The underlying facts of this case were stipulated by the parties. Respondent’s aunt, Ethel L. Parzen, passed away in January of 1979. Her will named her son, Zane Parzen, and a brother, Ben Levy, co-executors of the estate. The will was admitted to probate on February 1, 1979, and thereafter the co-executors asked Respondent to be the attorney for the estate. Eventually they gave him control of the administration of the affairs of the estate and of the principal assets of the estate by adding his name to the estate cheeking account and permitting him to sign checks in his individual name. The will bequeathed one-half of the decedent’s residuary estate to her son, Zane, and the other half to Respondent as trustee of a trust whose beneficiary was decedent’s grandson, Louis Parzen, a ten-year old boy. Respondent knew both Louis and his mother, Eleanor.
 

 Commencing on January 22,1980, Respondent commingled estate funds with his own money and began expending them for his personal benefit. During the next year, Respondent used $65,000 of estate funds on his personal expenses. During the following four years, he commingled with his personal funds another $7,500. Finally, on February 18, 1985, Respondent commingled $245.13 when the estate checking account was closed. He used the funds for his children’s college education, family medical expenses, and the repayment of bank loans. Respondent did not prepare or file an inventory of the estate assets or an Indiana Inheritance Tax Schedule until March of 1988, more than nine years after the estate was opened.
 

 The total value of the estate was approximately $300,000. On three separate occasions, May 8, 1980, August 2, 1985, and on October 12, 1987, Respondent misrepresented to Louis’s mother and uncle, that the ultimate distribution to the trust will be between $25,000 and $40,000, when in fact, after October 12, 1987, there should have been more than $150,000 in assets available for distribution to the trust. In 1987, Respondent disbursed for Louis’s benefit what he purported to be trust funds, but the source of these funds was Respondent’s personal checking account.
 

 In January of 1988, Louis and his mother retained another attorney to inquire into Louis’s interest in the estate and under the trust. After numerous requests for accounting, Respondent admitted to the successor attorney that he had used estate assets for his personal needs.
 

 On July 25, 1988, Respondent made full restitution to the estate and personally paid Louis’s attorneys’ fees of $12,930. He also paid $83,386.12 to Zane Parzen, representing the remaining estate assets and interest due him. He paid $157,692.62, representing the estate distribution and interest, to Eleanor Parzen as trustee for Louis.
 

 The hearing officer concluded and we agree that the foregoing findings clearly and convincingly establish that Respondent violated several provisions of the
 
 Code of Professional Responsibility for Attorneys at Law,
 
 which Code was in effect at all times material, up to and including January 1, 1987, and also violated the superseding
 
 Rules of Professional Conduct,
 
 which became effective January 1, 1987. He prejudiced and damaged his client and failed to act with diligence and promptness, in violation of D.R. 6-101(A)(3) of the
 
 Code
 
 and Prof.Cond.R. 1.3. In addition, he failed to hold his client’s property separate from his own and failed to maintain complete records of the client’s funds, in violation of D.R. 9-102(A) and (B)(3) of the
 
 Code
 
 and Prof.Cond.R. 1.15(a). Respondent violated D.R. 1-102(A)(3) and (5) of the
 
 Code
 
 and Prof.Cond.R. 8.4(b) in that he committed the criminal act of conversion which act reflects adversely on his honesty, trustworthiness and fitness as a lawyer. Finally, Respondent violated D.R. 1-102(A)(4) of the
 
 Code
 
 and Prof.Cond.R. 8.4(c) by engaging in conduct involving dishonesty, deceit and misrepresentation.
 

 
 *793
 
 The contested issue in this case is not the underlying misconduct but the existence of mitigators and the extent of their impact on the conclusion of misconduct and assessment of disciplinary sanction.
 

 The Respondent has been a member of the Indiana Bar since 1962 and, with the exception of this incident, has had no other disciplinary proceedings against him. At hearing, several witnesses offered testimony as to his outstanding legal capabilities and integrity. Respondent has been active in numerous professional and civic organizations. He was a diplomat of the National Board of Trial Advocacy, Chairman of the Local Rules Revision Committee for the Northern District of Indiana, member of the American Trial Lawyers Association and the American Judicature Society, and a fellow of the Indiana Bar Foundation. He served on the Board of Directors of the Indiana Continuing Legal Education Forum, the Gary, Indiana, Legal Aid Society and the Lake County Bar Association and as Delegate to the Indiana State Bar Association. His civic activities included the Red Cross, the United Way, and the Munster, Indiana, Parent-Teacher Association.
 

 The pivotal mitigating factors relate to the injuries Respondent sustained in a serious automobile accident on February 6,1979. As a result, Respondent was hospitalized for approximately one week and remained in the intensive care unit for most of the time. Respondent suffered extensive injuries, including a serious concussion and a closed head injury. He has no memory of the accident and for a period of time thereafter, he had amnesia.
 

 During his convalescence, he was disoriented and confused and “seemed to be in another world.” Respondent also suffered physical pain and discomfort after the accident, including headaches which persisted for a couple of years. He encountered extreme fatigue after the accident, his hand-eye coordination deteriorated, and he suffered memory deficits which caused him to start extensive note taking in order to remember everything.' He had substantial problems concentrating, suffered from depression, and his efficiency in the practice of law dropped as a result. On two occasions, Respondent failed to file timely pleadings before the statute of limitations and other applicable deadlines expired. There was also testimony indicating that Respondent underwent a personality change and became withdrawn.
 

 Expert medical testimony from physicians examining Respondent after the accident and during 1980 concur with the above description of Respondent’s condition. One of the treating physicians captioned his report on Respondent “A case of a patient with post-traumatic stress syndrome.”
 

 In May of 1990, the Disciplinary Commission filed its Verified Complaint alleging misconduct. Sometime after November, 1990, Respondent was seen by Dr. George H. Pollack, currently a professor at Northwestern University Medical School. An EEG ordered by Dr. Pollack revealed minimal focal slow wave abnormality in both temporal areas of the brain. An EEG taken ten years earlier had revealed similar abnormalities. Based on this and Respondent’s prior history, Dr. Pollack opined that “the conduct which led to the disciplinary action could be related to the trauma and impairments resulting from the automobile accident in which he was injured.” Dr. Pollack believed that Respondent suffered from Post Traumatic Stress Syndrome which can affect judgment that in turn may well lead to actions inconsistent with one’s values. He opined that it is unlikely that Respondent would engage in inappropriate conduct in the future.
 

 Dr. Hanus J. Grosz, a psychiatrist and neurologist and former Chief of Neurology at the Indiana University School of Medicine and Chief of Psychiatry Services at the V.A. Hospital in Indianapolis, reviewed the above reports and disagreed with the diagnosis of Post Traumatic Stress Disorder and with the conclusion that Respondent’s misconduct could be connected to his physical and psychological injuries sustained in 1979. It was Dr. Grosz’s opinion that Respondent does not meet at least two of the four criteria that must be present to permit a diagnosis of Post Traumatic Stress Disorder. Respondent has no memory of the accident and has never reported having any recurrent intrusive recollection of the accident. Further, he does
 
 *794
 
 not have persistent avoidance of stimuli that are associated with the experience. Dr. Grosz concluded that Respondent’s unethical conduct is in no way diagnostic of Post Traumatic Stress Syndrome.
 

 In January of 1993, Respondent also saw Dr. Louis Cavanaugh, a professor in the Department of Psychiatry at Rush Medical College in Chicago, and the Director of its Section on Psychiatry and the Law. Dr. Cavanaugh referred Respondent to his associate, Dr. David Hartman, for further interviews and psychological and neuropsychological tests. Based upon his own and Dr. Hartman’s reports, Dr. Cavanaugh concluded that (a) Respondent suffered a physical (organic) brain injury which impaired his functioning; and (b) Respondent’s impairment led to the commingling of funds. But he did not believe that Respondent suffered from Post Traumatic Stress Syndrome. Dr. Hartman also concluded that Respondent had suffered injury to the “pre-frontal, temporal and especially callosal structures” which areas of the brain control judgment, impulsive behavior, and control memory and concentration. Dr. Cavanaugh concluded that the combination of physical brain injury and the psychological difficulties attendant to coping with the physical problems were directly related to Respondent’s commingling of estate funds. Dr. Cavanaugh also concluded that, over the past 14 years, Respondent is much improved and has developed a series of highly effective coping strategies to minimize residual symptoms. He concluded that Respondent is fully fit, from a neuropsychiatric standpoint, to continue to actively and effectively practice law.
 

 Dr. Grosz again strongly disagreed with the above diagnosis and opinion. Dr. Grosz specifically disagreed with the interpretation of the tests administered on Respondent by Dr. Hartman. He opined that Respondent’s conduct showed a great deal of foresight and a great deal of ability both to repeat the same behavior and to cover it up, contrary to one with impaired judgment. In Dr. Grosz’s experience, individuals suffering pre-frontal lobe injuries do not engage in a particular type of improper act to the exclusion of other improper acts. Rather, they become amoral in a general sense. He opined that a person with pre-frontal lobe injury would not care, as Respondent testified he did, as to the eon sequences of his actions. It was his opinion, that Respondent’s unethical and illegal conduct was not a manifestation of an ongoing impaired neuropsychiatric status.
 

 The hearing officer concluded that the Respondent engaged in the charged misconduct, but that his ability to judge was impaired due to brain injury sustained in the automobile accident, and that he is now fit to practice law.
 

 After a careful review of the findings, the extensive record filed in this case, and the parties’ pleadings, we come to the conclusion, as did the hearing officer, that Respondent engaged in misconduct. However, the hearing officer recommended that the Respondent be allowed to continue to practice law. The' Commission vigorously contested this, with which position we agree. Thus, we reach a different conclusion as to Respondent’s fitness as a lawyer, and find that his acts of misconduct do indeed affect his fitness as a lawyer. In this conclusion we are persuaded by several factors. We must not forget that the misuse of estate funds was not a single, impulsive act, indicating an aberration in judgment. It was a consistent effort directed toward one particular estate over a period of several years. Respondent went to great lengths to conceal his misdeeds during an even longer period of time. In 1980, 1985, and again in 1987, he misrepresented to Louis’s mother and uncle the amount that was due to be distributed to the trust. He concealed his misdeeds from the court by failing to file an inventory of estate assets and an inheritance tax schedule. Yet during this same period of time, there is no indication whatsoever of any other improper use of funds, and, according to all those who testified, there was not a hint of other unethical misuse of funds. None of those who testified indicated that they ever observed that Respondent’s sense of right or wrong or of propriety and ethics was diminished or different in any manner after the accident.
 

 Also, we find telling that during the same period of time when Respondent was helping himself to the Parzen Estate funds, he con
 
 *795
 
 tinued to live a very comfortable life style. After the automobile accident of 1979, Respondent incurred extensive medical expenses, and his income declined. However, in 1980, his income increased and surpassed what he had reported for 1978 by approximately $22,000. During the period in issue he purchased a $205,000 vacation home in Florida, constructed a $335,000 residence in Northwest Indiana, and gave a $30,000 wedding for a daughter. Moreover, he received some $60,000 settlement in late 1982 or 1983 as a result of his accident, but failed to use any of the proceeds to replace the estate funds. Respondent testified that he and his wife had always spent all of their income and, as of the 1980’s, neither he nor she had accumulated any savings of any kind whatsoever, either for their children’s college education or otherwise. They always lived, financially speaking, at the “top end ... playing catch up.” Respondent also testified that his use of estate funds was “something that was on my mind every day of my life.”
 

 Rather than adjust his standard of living to his income level, Respondent helped himself to the estate funds. This was easy to do as the funds were readily available to him and the detection of their misuse was not likely to happen for some time, and perhaps never, if he could replenish the assets before detection. Indeed, by failing to file inventory and tax schedule and by giving false reports as to the amount to be distributed to the trust, he effectively managed to conceal his misdeeds for more than eight years.
 

 There is no doubt but that Respondent suffered severe injuries in the 1979 accident and subsequent pain, depression, withdrawal, and impaired memory and concentration. There is also evidence that medical expenses and reduced productivity affected Respondent’s financial position. However, for nearly 11 years following Respondent’s accident, none of the treating physicians articulated that the injuries he sustained in the accident caused unethical and illegal conduct. The experts’ opinions based on examinations and evaluations dating since 1990 are in conflict as to whether Respondent suffered Post Traumatic Stress Syndrome and/or whether he suffered organic brain injury to the pre-frontal lobes. The experts also disagree as to the ultimate question, whether Respondent’s brain injuries were such that they impaired his judgment and caused his unethical conduct. We find that Respondent’s “selectively” impaired judgment and his admitted, continuing cognizance and guilt is inconsistent with the proffered opinion of unethical conduct induced by brain injury or Post Traumatic Stress Syndrome. We, thus, conclude that Respondent’s injury did not cause his unethical conduct but that these were conscious, volitional acts.
 

 The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence.
 
 [1]
 
 Review of Respondent’s conduct under this standard indicates the highest degree of culpability and clearly warrants disbarment.
 
 Matter of Long
 
 (1993), Ind., 619 N.E.2d 919;
 
 Matter of Deloney
 
 (1984), Ind., 470 N.E.2d 65;
 
 Matter of Hayes, Jr.
 
 (1984), Ind., 467 N.E.2d 20. But we also look to the mitigating factors. The lack of prior disciplinary actions, Respondent’s high regard among the legal community, his extensive civic and professional contributions, and the stresses and financial strains accompanying the unfortunate automobile accident are matters we consider in assessing an appropriate sanction.
 
 [2]
 

 In light of these considerations, we conclude that a period of suspension is warranted. It is, therefore, ordered that Respondent, Joel C. Levy, is hereby suspended from the practice of law for a period of not less than two (2) years, beginning July 25, 1994, at the expiration of which he may seek rein
 
 *796
 
 statement pursuant to Admission and Discipline Rule 23.
 

 Costs of this proceeding are assessed against Respondent.
 

 ORDER GRANTING MOTION TO EXTEND THE EFFECTIVE DATE OF SUSPENSION AND AMENDING PER CURIAM OPINION IN ACCORDANCE THEREWITH
 

 DeBRULER, Acting Chief Justice.
 

 On June 24, 1994, this Court handed down a
 
 per curiam
 
 opinion styled
 
 In the Matter of Joel C. Levy,
 
 case number 45S00-9005-DI-377, therein suspending the respondent from the practice of law for a period of two (2) years, beginning July 25, 1994. The respondent, by counsel, thereafter filed with this Court his “Motion to Extend the Effective Date of the Suspension,” asserting that commencement of the suspension on that date would work a hardship on numerous clients of respondent and the court system generally, due to the number and complexity of legal proceedings pending in which the respondent is acting as sole counsel for such clients. The respondent therefore requests that commencement of the suspension be postponed until September 30, 1994.
 

 And this Court, being duly advised, now finds that the respondent’s request for a postponement of commencement of his suspension should be granted.
 

 IT IS, THEREFORE, ORDERED that commencement of the respondent’s suspension from the practice of law, imposed in
 
 In the Matter of Joel C. Levy,
 
 case number 45S00-9005-DI-377, is postponed until September 30, 1994. After commencement of the respondent’s suspension, on that date, such suspension shall continue thereafter for a period of not less than two (2) years, at the expiration of which the respondent may seek reinstatement pursuant to Ind.Admission and Discipline Rule 23.
 

 IT IS FURTHER ORDERED that the
 
 per curiam
 
 opinion handed down by this Court on June 24, 1994, styled
 
 In the-Matter of Joel C. Levy,
 
 case number 45S00-9005-DI-377, shall remain in full force and effect, with the exception that the effective date of the respondent’s suspension is hereby amended in accordance with this Order.
 

 The Clerk of this Court is directed to forward notice of this Order to the respondent and his attorney, to the Indiana Supreme Court Disciplinary Commission, and to all other persons and entities in accordance with Admis.Disc.R. 23, Section 3(d).
 

 GIVAN, J., dissents.
 

 [1]
 

 .
 
 American Bar Association Model Standards for Imposing Lawyer Sanction, Theoretical Framework.
 

 [2]
 

 .
 
 American Bar Association Model Standards for Imposing Lawyer Sanctions,
 
 Standard 9.3.