# IN THE SUPREME COURT OF IOWA

No. 95 / 07-0386

Filed March 14, 2008

**IOWA SUPREME COURT ATTORNEY
DISCIPLINARY BOARD,**

Appellee,

vs.

**KENNETH KRESS,**

Appellant.

On review of the report of the Grievance Commission.

Iowa Supreme Court Grievance Commission recommends a one-year suspension of the respondent's license to practice law. **LICENSE SUSPENDED.**

Leon F. Spies of Mellon & Spies, Iowa City, for appellant.

Charles L. Harrington and David J. Grace, Des Moines, for appellee.

**APPEL, Justice.**

This attorney disciplinary proceeding stems from allegations of academic impropriety by an Iowa lawyer. The Iowa Supreme Court Attorney Disciplinary Board (Board) charged former University of Iowa law professor Kenneth Kress with two violations of the Iowa Code of Professional Responsibility for Lawyers—DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) and DR 1–102(A)(6) (a lawyer shall not engage in any other conduct that adversely reflects on the fitness to practice law). The charges stem from allegations that Kress raised the scores on two student evaluations and manufactured three highly positive evaluations in order to improve markedly his teaching effectiveness score.

After an evidentiary hearing, the Iowa Supreme Court Grievance Commission (Commission) sustained the violations and recommended that Kress be suspended from the practice of law for a period not less than one year. Upon our de novo review, we find Kress violated DR 1–102(A)(4). We suspend Kress's license indefinitely with no possibility of reinstatement for three months and impose conditions on his possible readmission.

## I. Factual and Procedural Background.

**A. Background of Kenneth Kress.** Originally from California, Kress graduated from Boalt Hall School of Law at the University of California, Berkeley, in 1985. After graduating law school, Kress accepted a teaching position at the University of Iowa College of Law. Four years later, he earned a doctorate in jurisprudence and social policy from Boalt and was promoted from associate professor of law to full professor. Over his lengthy academic career, Kress has lectured on a multitude of topics, ranging from Torts to Jurisprudence to Mental Health Law. Nationally recognized

scholars have glowingly praised Kress's scholarship for its originality, incisiveness, and descriptive power. While Kress has published in a number of areas of law, he is particularly well-known as one of the leading scholars nationally in mental health law. Without question, Kress is an intellectually gifted lawyer.

Unfortunately, Kress has had a difficult medical history. He experienced depression as a child. In adolescence and as a young adult, he suffered two head injuries, one of which was quite severe. After a period of psychological difficulty, Kress was diagnosed in 1990 as having bipolar affective disorder. His mental health difficulties have been exacerbated by physical health complications. Among other things, Kress suffers from obstructive sleep apnea and diabetes mellitus. As a result of sleep apnea, Kress is often awake late into the night. Regulation of his diabetes requires Kress to monitor his blood sugar level regularly and inject insulin as needed. The combination of these mental and physical illnesses resulted in hospitalizations in 1990, 1994, and 2002. Hospital records reveal occasions when Kress was noncompliant with hospital rules, engaged in conflict with hospital staff, and refused to follow medical advice.

**B. Events in April 2004.** In early April, Kress exhausted his supply of Risperdal, a drug which his treating psychiatrist, Dr. Richard Michaelson, prescribed to treat his bipolar disorder. Kress's significant other, Donna Meek, is a mental health advocate knowledgeable about psychological disorders. Meek noted that in the days preceding the incident in question Kress "just sort of wilted" and retreated to a bedroom in his basement for the weekend. Meek observed that Kress generally had an inability to track over the weekend and suffered from delusions. On Sunday, Meek questioned whether Kress should go to school the next day,

but Kress indicated that he would go straight to school and come straight home afterward.

On Monday, April 19, the students in Kress's classes were to complete faculty evaluations. Scores on student evaluations are a factor in determining who is appointed to faculty chairs at the law school. Kress believed that he had been treated badly by the law school because he deserved to be appointed to a faculty chair, but had not yet received one.

In order to protect the integrity of the student evaluation process, written university policy requires student evaluations to be confidential and completed without the presence of the faculty member. Faculty members are advised to have their secretary administer the evaluations, collect them, and present them to the administration in order to avoid all appearances of impropriety.

The evaluations for Kress's first class in the afternoon were administered properly and without incident. The second class was a mental health law seminar consisting of ten students which met in the evening after his secretary had gone home for the day. Kress arrived at the seminar as scheduled.

At the evening seminar, Kress decided to pass out the evaluations himself. Prior to disseminating them, however, Kress gave a ten-to-fifteen-minute speech about the importance of the evaluations, stressing that his job was "on the line." Kress attributed his problems at the law school to jealousy among the faculty. The only student who testified at the hearing indicated that Kress's demeanor was normal, that he spoke at his normal rate, did not exhibit frenzied excitement or seem confused, his speech was not disordered or rambling, and that he seemed logical.

After handing out the evaluations, Kress remained in the classroom. His continued presence while students completed the evaluations was against university policy. His research assistant, however, urged him to leave the room, and Kress complied.

After Kress left, the students engaged in a discussion about his conduct. Several students indicated that they were going to fill out the evaluations honestly regardless of Kress's comments. The students agreed that Kress's research assistant should collect the finished evaluations and return them to the administration in the morning, a common practice when classes are held in the evening.

When the students left the classroom after completing the evaluations, they found Kress in the immediate area outside, giving rise to concern that Kress may have overheard their discussion about the propriety of his conduct. When Kress's research assistant told Kress that he would drop off the evaluations with the secretary in the morning, Kress directed that he and his assistant would take the evaluations up to the secretary's office that evening. This conversation took place in front of the other students, who exchanged concerned glances with each other. Kress then escorted his research assistant to his secretary's office, where Kress unlocked the door, and instructed the research assistant to leave the evaluations inside. His research assistant hoped that Kress would leave the building with him, but Kress remained behind. When the research assistant left the building, he met classmates and a further discussion of their concerns over the evaluation process ensued.

The next day a student informed Associate Dean of Student Affairs Linda McGuire about Kress's actions. Thereafter, the law school administration conducted a confidential investigation. The investigation

determined that three neutral or unfavorable evaluations were discarded and replaced with favorable versions, two were altered in order to raise the scores, and two evaluations were unchanged. The effect of the changes was to raise Kress's composite teaching effectiveness score on a five point scale from 2.86, a relatively low score that might attract the attention of law school administrators, to 4.86, a very high score that few members of the faculty were able to achieve. When confronted with the results of the investigation, Kress did not claim a medical or mental defense.

### C. Defense of Diabetic and/or Psychotic Delirium.

1. *Direct testimony by Kress.* At the hearing, Kress admitted in light of the evidence that he must have tampered with the evaluations. Kress asserted, however, that at the time he suffered from mental and physical illnesses that excused or mitigated his conduct.

With respect to April 19, Kress recalled giving what he characterized as an "irrelevant speech" to the evening seminar about the law school conspiracy against him. He further testified that he recalled going to his secretary's office with his research assistant after class.

Kress noted that after going with his research assistant to his secretary's office, he woke up in his own office, either from sleep or from a "delirious loss of consciousness" after hallucinating about two dogs. He told the Commission that he believed that conspirators had succeeded in sending rays into the students' minds, changing their neurons, and altering their answers on the evaluations. Kress further testified that in light of the mind-changing rays, he believed that it was only fair for him to change the evaluations back, so they would be correct.

Kress believed he was confronted with a matter of life or death. He hallucinated about being in prison, where a medieval jury was laughing at

him for failing to save the world from the parade of horribles that was coming. Changing the evaluations thus was transformed from a personal matter to a universal struggle between good and evil.

After recounting this delusionary experience, Kress maintained that he had no recollection of actually altering the evaluations. He did recall checking his blood sugar in his office at some time, which he asserts yielded a score of 565, the highest level Kress had ever personally recorded. Kress then administered thirty units of insulin to address the problem. Kress further recalled retrieving some reading materials from his secretary's office and walking out of the building, but did not recall the trip home.

The records of the device used in his office to monitor his blood sugar were not available at the hearing, but Kress offered into evidence records from the machine he used at home. These records indicated that after he left the building and returned home at 11:00 p.m., Kress's blood sugar reading was at 403. It then gradually rose to a high of 548 after midnight before receding.

2. *Medical report offered by the Board.* The Board submitted a report by Dr. Anna Lembke, a psychiatrist in the Department of Psychiatry and Behavioral Sciences at the Stanford University School of Medicine. While conceding that delirium was plausible, Lembke opined that it was "not probable that the incident in question was due to delirium." Citing the Diagnostic and Statistical Manual of Mental Illness IV's (DSM IV) definition of delirium, Lembke noted that Kress was able to converse intelligibly with a classroom of students, wait in a purposeful manner while the evaluations were being completed, accompany his research assistant to the office with the evaluations, read the evaluations, remove the ones that reflected poorly on him, and systematically manufacture or alter evaluations to produce a

desired result. This sustained, purposeful, and concentrated effort "would not have been achievable by an individual with [the] waxing and waning of consciousness" normally associated with delirium. Further, Lembke noted that it was "not probable" that Kress would have been able to check his blood sugar after the lecture, administer insulin, and drive home, as he reported doing, if he was in a state of delirium.

Lembke also addressed more generally the role of mental illness in connection with the incident. She noted that Kress reported to her that his delusional thoughts were completely resolved the day after the incident. Lembke opined that such rapid resolution is not the natural pattern of psychosis, particularly manic psychosis, which ordinarily takes weeks to resolve. Additionally, she also noted that while Kress described himself as someone who immediately seeks treatment when he knows he is medically ill, Kress did not do so on April 19 notwithstanding his self-reported severe and dramatic psychotic symptoms.

Lembke did, however, allow that mental illness might have played a minor contributing role in the events on April 19. She theorized that narcissistic personality traits, which made negative reviews of any kind intolerable to Kress's fragile ego, possibly combined with hypomania, may have contributed to Kress's conduct.

3. *Medical reports and testimony submitted by Kress.* In response to Lembke's report, Kress offered several expert medical reports and live testimony from Michaelson. Michaelson believed that high levels of blood sugar can cause delirium, which he defined as an acute, confused state consisting of a waxing and waning state of consciousness and impaired attention, often accompanied by delusions or hallucinations and marked distractibility. A person suffering from delirium would probably appear

disturbing, troubling, unusual, and erratic. Michaelson further noted that Kress had a minor history of delusions.

Assuming the accuracy of Kress's rendition of the facts, Michaelson concluded that Kress was suffering from delirium on the night in question, was not able to know what he was doing, and did not know the difference between right and wrong.

Kress also offered into evidence a letter from his treating therapist, Dr. Charles Fisher. Fisher stated that he was very concerned about Kress's deteriorating mental condition in March and early April 2004. Based on his discussions with Kress, Fisher concluded that the April 19 incident was caused by delirium, due to out of control diabetes, complicated by mental illness. Other medical evidence, however, questioned the role of Kress's diabetes in the incident. Fisher also emphasized his view that Kress was an individual of unusually high integrity and that he had been utterly frank with him about his behavior, including when it was potentially disadvantageous to him.

Fisher also challenged the veracity of Lembke's results. Fisher took Lembke to task for failing to consider criteria for delirium in the DSM IV, for expressing her opinions in a conclusory manner, for noting but not considering the impact of traumatic brain injury in her analysis, for failing to consider Kress's history of cognitive or amnesic episodes, for confusing delirium and delusion, and for suggesting that narcissistic personality disorder would be consistent with an intolerance to negative student reviews.

Kress further submitted a letter by Dr. Richard LeBlond, Professor of Internal Medicine at the University of Iowa College of Medicine who had treated Kress over the past several years. LeBlond characterized the events

of April 19 as a "distinctly unusual event" for Kress. He reviewed the blood sugar levels that Kress experienced, noting that the elevated levels "can induce significant metabolic abnormalities." LeBlond noted that Kress's memory loss suggested that his judgment may have been clouded by a metabolic brain state due to high blood sugar and medications inducing a transient delirium. LeBlond noted, however, that it was impossible to make a firm determination of the nature of the event, but that the possibility of metabolic disturbance needs to be considered.

Kress also submitted a report by Dr. Michael First, a psychiatrist on the faculty at Columbia University. First opined that Kress was suffering from an exacerbation of his long-standing bipolar disorder and met criteria for a manic episode with psychotic features. First concluded that the episode was related to the discontinuation of his antipsychotic medication two weeks earlier and daily doses of stimulants. First opined that the fact that Kress could lecture earlier in the evening and then have severe clouding of consciousness was not inconsistent with a diagnosis of delirium.

First noted that Kress's manner of altering the evaluations was consistent with his opinion. First observed that if Kress had intended to alter the evaluations, it is unlikely that he would have preceded the evaluation process with an appeal for leniency. Further, First cited the crudeness of the alterations—the use of the same dark pencil on all substituted evaluations, the use of the same handwriting style on all altered forms, and the crude erasure of average scores and replacement with top scores—as indicating manic delusions. Kress's actions, according to First, were a direct manifestation of his psychotic belief that he was counteracting the effects of the administration's mind control efforts which was a manifestation of the acute exacerbation of his long-standing bipolar illness.

Each of the doctors presented divergent opinions as to Kress's present and future fitness to practice law. Lembke advised that Kress's current psychiatric problems qualified him for total disability. Michaelson indicated that Kress could not handle the stress of teaching law but might be able to handle a limited practice. Fisher indicated that the complicated set of circumstances which Kress experienced in April 2004 were unlikely to recur. First stated that if Kress immediately sought consultation at the first sign of hypomania and discontinued the use of stimulants at high doses, his future prognosis to return to work is excellent.

**D. Findings and Recommendations of the Commission.** The Commission determined that the Board had proven the alleged ethical violations by a convincing preponderance of the evidence. In making this finding, the Commission relied on the analysis and conclusions in the Lembke report, the testimony of Michaelson that delirium is usually accompanied by disturbing, troubling, unusual or erratic behavior (evidence of which was notably absent from the record), the presence of a motive for Kress to alter the evaluations, the lack of supportive contemporaneous medical records upon which Kress's experts could rely in reaching their exculpatory opinions, and Kress's demeanor, which the Commission found resembled a person who thought he was above the law until he was caught.

The Commission recommended, based upon the seriousness of the alleged misconduct and its determination that Kress had an apparent intent to deceive it, that his license to practice law be suspended indefinitely with no possibility of reinstatement for one year. The Commission also suggested that Kress undergo and pass a complete mental health evaluation by a mental health professional before reinstatement and comply with all

physicians' orders regarding his ongoing mental health care as a condition for maintaining his license.

## II. Standard of Review.

In disciplinary matters, this court engages in a de novo review. Iowa Ct. R. 35.11(3); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Walker*, 712 N.W.2d 683, 684 (Iowa 2006). The Board must prove ethical violations by a convincing preponderance of the evidence. *Id.* On review, the court may adopt, increase, or reduce the sanction recommended by the Commission. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Eich*, 652 N.W.2d 216, 217 (Iowa 2002).

## III. Discussion.

**A.    Positions of the Parties.**    Kress does not deny that he manufactured and altered the student evaluations on April 19, 2004. He also recognizes that this court has long rejected contentions that a lawyer's mental or emotional problems constitute a *defense* to attorney disciplinary actions. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Thompson*, 595 N.W.2d 132, 136 (Iowa 1999); *Comm. on Prof'l Ethics & Conduct v. Tompkins*, 415 N.W.2d 620, 623 (Iowa 1987); *Comm. on Prof'l Ethics & Conduct v. Silver*, 395 N.W.2d 877, 878–79 (Iowa 1986).

Kress attempts to distinguish these cases, however, by arguing that under DR 1–102(A)(4), intent is an *element* that the Board must prove by a convincing preponderance of the evidence. Kress cites cases from other jurisdictions finding such an intent requirement in equivalent ethical provisions. *Disciplinary Matter Involving West*, 805 P.2d 351, 353–54 (Alaska 1991); *State ex rel. Okla. Bar Ass'n v. McMillian*, 770 P.2d 892, 899 (Okla. 1989). Kress argues in light of the "unique and unprecedented circumstances" of this case, he could not form the level of intent necessary

to commit this ethical violation. In the alternative, Kress argues that his health status should mitigate any sanction.

In response, the Board does not challenge Kress's assertion that intent must be proven in order to establish a violation of DR 1–102(A)(4). Instead, the Board responds by emphasizing the purposeful nature of Kress's activities on April 19. The Board also asserts that Kress's behavior amounts to conduct adversely reflecting on the practice of law, as then prohibited by DR 1–102(A)(6).

**B.** **Requirement of Intent and Availability of Affirmative Defenses Related to Mental Capacity.** This court has held that intent is a required element for misrepresentation under DR 1–102(A)(4). *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Moorman*, 683 N.W.2d 549, 553 (Iowa 2004). We believe there is also an intent requirement for fraud, dishonesty, and deceit under DR 1–102(A)(4). *Att'y Grievance Comm'n of Maryland v. Clements*, 572 A.2d 174, 179 (Md. 1990). For the purpose of the disciplinary rules, the intent requirement is satisfied where the evidence shows that the actor intends the natural and logical consequences of his or her acts. *Matter of Levy*, 637 N.E.2d 795, 799 (Ind. 1994) (holding that intent is shown "where lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result"). Where the record reveals mere haste or oversight, however, there is no violation of DR 1–102(A)(4). *Comm. on Prof'l Ethics & Conduct v. Bitter*, 279 N.W.2d 521, 526 (Iowa 1979). In order for Kress's conduct to arise to a DR 1–102(A)(4) violation, the Board must prove intent by a convincing preponderance of the evidence. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 142 (Iowa 2004) ("This burden is less than proof beyond a

reasonable doubt, but more than the preponderance standard required in the usual civil case.").

Once the Board has shown an intentional act of fraud, dishonesty, deceit, or misrepresentation, the affirmative defenses of insanity or mental incapacity are unavailable. While insanity is a recognized defense in criminal proceedings, it is not recognized in attorney disciplinary proceedings. *Silver*, 395 N.W.2d at 878–79. Certainly, where fraudulent, deceitful, or dishonest acts occur, claims that the attorney was acting as a result of mental aberration or amnesia depriving him or her of the ability to distinguish between right and wrong are of no avail. *See, e.g., In re Hoover*, 745 P.2d 939, 945–46 (Ariz. 1987) (holding that manic depressive could not assert as a complete defense his inability to distinguish right from wrong in case involving misappropriation of client funds); *La. State Bar Ass'n v. Theard*, 62 So. 2d 501, 503 (La. 1952) (holding that insanity defense was not available where attorney engaged in forgery and conversion of client funds even though he had no recollection of events); *In re Houtchens*, 555 S.W.2d 24, 26 (Mo. 1977) (holding that attorney who converted client funds who suffered from pscyhotemporal epilepsy reflected in periodic amnesia, disorientation, and confusion could not raise defense of severe mental or physical problems); *In re Fallick*, 286 N.Y.S. 581, 583 (App. Div. 1936) (holding that a lawyer who converted funds but suffered from mental illness and lapse of memory was subject to sanction). *But see In re Conduct of Holman*, 682 P.2d 243, 261 (Ore. 1984) (holding that heavy alcohol abuse and addiction to prescription drugs showed lack of appreciation of ethical violation necessary to support violation of ethical rule prohibiting conduct involving dishonesty).

The principal reason for refusing to accept affirmative defenses based on mental health is the need to protect the public from dishonest acts of lawyers regardless of their mental health status. *See Silver*, 395 N.W.2d at 879; *Theard*, 62 So. 2d at 503; *Houtchens*, 555 S.W.2d at 26; *In re Fallick*, 286 N.Y.S. at 583. The primary purpose of attorney discipline is to protect the public, not mete out punishment. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford*, 625 N.W.2d 672, 684 (Iowa 2001).

There is a question, however, as to whether a claim of unconsciousness due to mental or other illness may under any circumstance wholly negate the intent requirement of DR 1–102(A)(4). To the extent there is any possibility that an attorney may claim unconsciousness to vitiate the intent element of the prima facie case in disciplinary cases involving dishonesty, fraud, deceit, or misrepresentation, the record must demonstrate a total and complete unconsciousness and not merely an assertion that the conduct in question was caused by or was a result of mental or other illness. *See State ex rel. Okla. Bar Ass'n v. Krug*, 92 P.3d 67, 79 (Okla. 2004) (Opala, C.J., dissenting) (discussing whether the criminal defense of automatism or total unconsciousness applies in attorney disciplinary context under applicable statute).

The framework of analysis is different, however, when considering alleged violations of DR 1–102(A)(6). Unlike DR 1–102(A)(4), intent is not a requirement for violation of DR 1–102(A)(6). Under DR 1–102(A)(6), the focus is on *conduct,* not the mental status of the actor. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Joy*, 728 N.W.2d 806, 814–15 (Iowa 2007); *State Bar v. Lerner*, 859 S.W.2d 496, 499–500 (Tex. Ct. App. 1993). With respect to violations of DR 1–102(A)(6), the Board is not required to show intent, but

only to show that the objective conduct of the lawyer reflects adversely on his or her fitness to practice law.

### C. Application of Legal Principles.

1. *Alleged violation of DR 1–102(A)(6).* The Board asserts that Kress violated DR 1–102(A)(6) by failing to manage his medical problems. *See Tompkins*, 415 N.W.2d at 623 (holding that a lawyer who fails to get help for compulsive mental illness while practicing law violates disciplinary rule). We are reluctant, however, to rely upon DR 1–102(A)(6) in this case. The new Model Rules of Professional Conduct adopted by this court in 2005 materially altered DR 1–102(A)(6) by limiting its scope to acts that amount to criminal transgressions. While Kress's failure to manage his medical conditions may have put him at risk of odd behavior, his failure to monitor and control his health problems does not amount to criminal activity. Although DR 1–102(A)(6) was in effect at the time of the alleged transgressions, we prefer not to impose a potentially serious sanction based upon an ethical norm that is no longer applicable. We find that the more pertinent question is whether Kress violated DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation), which is carried over in virtually identical form in the current Model Rules. *See* Iowa R. Prof'l Conduct 32:8.4(d).

2. *Alleged violation of DR 1–102(A)(4).* In determining whether Kress violated DR 1–102(A)(4), it is not disputed that Kress altered two student evaluations and manufactured three others to improve the overall composite rating of his teaching ability. Kress claims, however, that the Board cannot show the necessary intent because he was unconscious—due to delirium—when the acts were committed. We do not find it necessary to reach the theoretical question of whether intent can ever be defeated in a disciplinary

proceeding by claims of total unconsciousness because we find that Kress did not act in a totally unconscious fashion sufficient to vitiate intent.

We note that the independent expert from Stanford, Dr. Lembke, came to the conclusion that it was not probable that the incident in question occurred as a result of delirium in light of Kress's concerted, purposeful activity. Although Kress presented opposing medical testimony and reports, those opinions assume that Kress was in fact unconscious and then present diverse views on how such a mental state might have been caused. Further, even Kress's own medical reports do not consistently urge that Kress was totally unconscious when he altered and manufactured the student evaluations, but often suggest merely that Kress's conduct was out of character and that he was acting under the influence of delusions and psychotic beliefs.

In addition, the medical evidence presented by Kress was not always consistent with other evidence. For instance, Kress's own expert, Dr. Michaelson, testified that if Kress suffered from delirium, he would have probably appeared disturbing, troubling, unusual, and erratic to his students. The only student who testified at the hearing, however, stated that Kress appeared normal and that he did not appear rambling, confused, or frenzied.

Further, the total picture of Kress's behavior on the evening of April 19 suggests intentional, conscious conduct. The sequence of objective facts, which were essentially undisputed, show that Kress made improper remarks to his class about the student evaluations, remained in the classroom when the students were completing the forms in violation of university policy and left only when asked to do so by his research assistant, stationed himself just outside the classroom in a fashion that

caused student concern about his potential eavesdropping, did not allow his research assistant to take the evaluations home but instead escorted him to his secretary's office, to which he had a key, where the forms were left. It is undisputed that these acts amounted to intentional, conscious conduct. Kress then admits to altering the forms in a fashion that eliminated three neutral or negative evaluations, replaced them with newly minted favorable evaluations, and materially raised the score of two other evaluations. These actions were certainly not negligent, mistaken, or accidental. It is difficult to find that Kress was totally unconscious when he performed the systematic and organized acts of altering and manufacturing student evaluations in a fashion that dramatically improved his composite evaluation, particularly when these acts are consistent with his admittedly intentional and conscious conduct throughout the evening of April 19.

Kress's version of events does not challenge the objective facts but repeatedly focuses on his subjective state of mind. Even accepting Kress's testimony about his delusions, the asserted pattern of intentional, conscious conduct, interrupted at the key moment by a brief period of unconscious delirium in which the actus reus was performed on five evaluations, seems as improbable to us as it did to Lembke. Further, as noted by the Commission, Kress had motivation—possible promotion to an endowed chair—to change the evaluations.

Finally, while this court engages in de novo review, findings of credibility by the Commission are entitled to consideration. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGrath*, 713 N.W.2d 682, 695 (Iowa 2006). While Kress offered evidence of his character and integrity, the Commission did not believe Kress's rendition of events based in part on his demeanor. The Commission's finding with respect to Kress's demeanor is a factor that

reinforces our conclusion that the Board met its burden of showing a violation of DR 1–102(A)(4) in this case.

**D. Sanctions.** In considering sanctions, we agree with Kress that mental and physical conditions may be mitigating factors. The full extent of mitigation depends upon the relationship between the unethical conduct and the mental and physical illnesses. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Grotewold*, 642 N.W.2d 288, 295 (Iowa 2002).

Based on our review of the record, we find that Kress's health status obviously played a role in his behavior and should be considered in mitigation. While his acts remain intentional, and thus subject to sanction, we believe the record shows that Kress was experiencing an episode of mental health instability, along with poorly controlled diabetes. These conditions undoubtedly clouded his judgment on April 19.

We note that Kress has not had a history of disciplinary problems in the past and that he has spent years as a dedicated teacher. He has been engaged in the representation of mentally-ill clients on a pro bono basis or for a highly-discounted fee. These are mitigating factors to be considered in fashioning sanctions. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Frerichs*, 671 N.W.2d 470, 477–78 (Iowa 2003); *Comm. on Prof'l Ethics & Conduct v. Conzett*, 476 N.W.2d 43, 46 (Iowa 1991); *Comm. on Prof'l Ethics & Conduct v. Nadler*, 467 N.W.2d 250, 254 (Iowa 1991).

A potential aggravating feature is Kress's refusal to acknowledge the intentional nature of his misconduct. The nub of the issue is the truthfulness of Kress's claim not to remember altering and manufacturing the student evaluations. While it is possible that Kress does not remember the specifics of his actions as a result of amnesia, we conclude that Kress has been less than candid in his testimony to the Commission.

The most important factor in developing sanctions in this case, however, is protection of the public. *Silver,* 395 N.W.2d at 879. Kress concedes that he changed the scores on the student evaluations in a fashion that dramatically improved his composite score. Public confidence in our legal system demands more than a mild sanction for this type of conduct.

Under all the facts and circumstances, we order that Kress's license be suspended indefinitely with no possibility of reinstatement for three months. Upon application for reinstatement, Kress shall prove that he has not practiced law during the period of suspension and that he met the requirements for client notification set forth in Iowa Court Rule 35.21. Additionally, we further order that before Kress is readmitted to practice in Iowa, he undergo a comprehensive mental and physical health examination, which evaluates his present condition as well as his ability to control his diabetes and bipolar disorder, by a provider or providers approved by the Board. We further order that upon any application for reinstatement, Kress provide the Board with statements from his treating physicians that he has complied with all physicians' orders regarding his ongoing mental and physical health care.

**IV. Conclusion.**

Based on our de novo review, we order that the respondent's license to practice law be suspended indefinitely with no possibility of reinstatement for three months and place conditions on possible reinstatement.

**LICENSE SUSPENDED.**