# IN THE SUPREME COURT OF IOWA

No. 17–1599

Filed June 29, 2018

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

    Appellee,

vs.

**MARK T. HAMER,**

    Appellant.

---

On appeal from the report of the Iowa Supreme Court Grievance Commission.

Grievance commission recommends a six-month suspension of attorney's license. **LICENSE SUSPENDED.**

David L. Brown and Alexander E. Wonio of Hansen, McClintock & Riley, Des Moines, for appellant.

Wendell J. Harms, Tara van Brederode, and Susan A. Wendel (until withdrawal), for appellee.

**APPEL, Justice.**

In this attorney disciplinary case, we are called upon once again to remind the Iowa bar that while our ethics rules allow attorneys to engage in financial transactions with clients and to represent both party clients in a financial transaction, the demanding nature of the disclosures required and the necessity of documenting informed consent mean that these matters may not be undertaken lightly as a matter of informal routine.

The Iowa Supreme Court Attorney Disciplinary Board (Board) charged attorney Mark Hamer with multiple violations of the Iowa Code of Professional Responsibility for Lawyers (code) and the Iowa Rules of Professional Conduct (rules)[1] arising from (1) several loan transactions occurring between multiple clients of Hamer without adequate conflict-of-interest disclosures and informed consent, (2) several loan transactions involving Hamer and a client without adequate conflict-of-interest disclosures and informed consent, (3) two failed joint investments in which Hamer and his client suffered substantial losses, and (4) a clearly excessive and dishonest attorney's fee collected through a bonus to which the client did not agree. Hamer denied the allegations.

After an evidentiary hearing involving only two witnesses but over 2200 pages of documents, the Iowa Supreme Court Grievance Commission (commission) found Hamer violated numerous code and rule provisions with respect to the loans and the attorney's fee issues but declined to find an ethical violation in connection with the failed

---

[1]Prior to July 1, 2005, an Iowa lawyer's conduct was governed by the code. Thereafter we adopted the rules. Because some of Hamer's alleged misconduct occurred prior to July 1, 2005, and some after, the Board has alleged violations under both ethical standards.

investments. As a result, the commission recommends that Hamer's license to practice law be suspended for six months.

Upon our de novo review, we conclude Hamer engaged in a number of ethical violations in connection with the loan transactions between Hamer's clients and between Hamer himself and Douglas Paul. We also find Hamer engaged in deceit in connection with the bonus payment for legal work. Based on the violations, we conclude a six-month suspension is the appropriate sanction.

**I. Factual and Procedural Background.**

**A. Background to the Events at Issue.** Hamer received his license to practice law in Iowa in 1972 and represented businesses, entrepreneurs, franchisors, and franchisees for forty years. During all times relevant to the allegations in the complaint, Hamer worked for a prominent Iowa City law firm.

In 1982, Douglas Paul, an entrepreneur in the field of education, founded an education writing and editing business that eventually became known as Buckle Down Publishing Company. Buckle Down developed customized curriculum materials for school districts. Paul also owned ZAPS Learning Company, an ACT and SAT student-test-preparation company. In 1988, Hamer became Paul's attorney for both business and personal matters. In addition to their business relationship, Hamer and Paul became friends and frequently socialized together.

In 2004, Hamer helped Paul sell both Buckle Down and ZAPS. Paul sold his interest in Buckle Down for $23 million cash and some preferred stock. Paul also sold his interest in ZAPS for $1.5 million. DLP Management, an entity wholly owned by Paul, was formed to handle the money generated by the sale of Buckle Down.

**B. Bonus for the Successful Sale of Buckle Down.** Paul was pleased with the Buckle Down sale and wanted to reward the people who worked on the transaction. Paul considered giving a cash bonus to Hamer, an accountant, and a secretary. The record does not clearly establish the amount of the proposed bonus that Paul was considering giving Hamer.

On April 15, Hamer accepted the bonus for his secretary, but told Paul that a cash bonus for himself was problematic because he would be required to share the bonus with the other partners of the law firm. Five days later, Hamer told Paul that the legal fees in connection with the Buckle Down transaction were $268,447.13. Paul paid the fees on April 21 and received an unitemized bill. The unitemized bill did not state it included a $110,000 bonus fee. When Paul received the unitemized bill he requested an itemized fee statement, but Hamer demurred. He told Paul he would give Paul an itemized bill the following week but did not do so.

On July 28, a Paul-owned entity made a five-year loan of $1,000,000 at 2.5% yearly interest to a Hamer-owned entity, Quad Four, L.L.C. Paul claimed this attractive loan was three percent below what Hamer would have otherwise been required to pay and was made in lieu of a cash bonus on the Buckle Down transaction that Hamer would have had to share with other members of the firm if paid as part of the bill.

Over the years, Paul continued to press Hamer several times for an itemized bill related to the Buckle Down transaction, including in an email on January 21, 2009. Hamer did not provide an itemized bill, however, until Paul's new lawyer sent a demand letter asking for documentation in early 2010.

When Paul received the itemized bill in February 2010, there was a note in Hamer's handwriting attached to the file copy of Paul's payment check stating the bill included a $110,000 bonus. The note attached to the check included the words "CF Doug Paul 4/20/04." Paul later testified that the notation meant nothing to him. Paul stated he did talk to Hamer on April 20, 2004. He claimed, however, there was no discussion about the bonus but only about the total amount of the bill.

**C. Paul's Investments with Other Hamer Clients in "Private Banking."** After the sales of Buckle Down and ZAPS in 2004, Paul began making investments that he and Hamer called "private banking." In these transactions, Paul directly loaned money to individuals and businesses.

From March 2004 to August 2005, Hamer presented to Paul, and Paul accepted, opportunities to loan money to nine individuals or entities who were also clients of Hamer. In all but one of the loans, Hamer made no effort to get Paul's informed consent in writing. Paul would later testify he had no knowledge the other parties in these loans were Hamer's clients. He also testified that Hamer never discussed the perils of multiple representation or obtained Paul's verbal informed consent to any real or potential conflicts of interest arising out of the transactions. Paul also testified Hamer informed him that most of the loans would be secured by adequate collateral. In fact, Hamer never perfected the various security interests or filed the required mortgages nor did he advise Paul that Paul would need to do so himself.

Paul signed a multiple-client representation letter dated December 29, 2004, that he received from Hamer for one of the transactions. The letter began, "As we understand your request, we will be dealing with the documentation and reporting relating to these

transactions." The letter was lengthy and contained mostly generalizations:

> Before entering in this agreement, we believe it is necessary and appropriate for us to spell out for you the potential ramifications of our representation of you.
>
> As you may be aware, the Iowa Code of Professional Responsibility for Lawyers, and in particular Canon 5, requires that a lawyer must exercise independent professional judgment on behalf of his client. In this connection, any lawyer requested to undertake representation of multiple clients having potentially differing interests must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts the employment and the lawyer must resolve all doubts about the propriety of the representation prior to accepting the engagement. Once a lawyer accepts such employment and in the event the interests of the clients do become actually differing, the lawyer must withdraw from the employment.
>
> There are, of course, many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involving litigation. For example, if the interests vary only slightly, it is generally likely that the lawyer will not be subjected to an adverse influence and can retain his independent judgment on behalf of each client and if the interests do become differing, withdrawal is less likely to have a disruptive effect upon the clients.
>
> However, in those instances in which a lawyer is justified in representing multiple clients, it is nevertheless essential that each client be given the opportunity to evaluate his need for independent representation and to obtain other counsel if desired. Further, each client should be fully advised concerning the implication of the common representation (which we hope this letter will do) and be fully advised as to any other circumstances that might cause one of the clients to question the undivided loyalty of the lawyer to the engagement and or interests of all the clients (which we will do later in this letter).
>
> . . . .
>
> In regard to our requested representation, we have evaluated our knowledge of your respective interests. It appears to us that all of you are experienced; that you are willing and capable of completing these transactions; that you can make relatively equal though substantially different business

decisions; and, finally, that you appear to share the same business philosophy. While those factors alone are not enough to suggest that you should enter into this transaction, these factors do suggest to us that your individual interests and goals are sufficiently similar to convince us that we can represent you without any concern of the propriety of the multiple representation and without any concern that our judgment will be impaired or our loyalty divided among you.

On the other hand, however, you must both be advised (and we're sure already know) that the undersigned have previously represented all of you extensively and for many years. We anticipate continuing to represent all of you on a variety of matters. In addition, we anticipate that all of you will request that we give our opinion as to the structure, wisdom and advisability of your business transaction as it related to each of you and that we will provide our opinion(s) to you at all times during the engagement.

We do not anticipate that there will be any conflicts arising which might threaten the transaction between you. However, in the event of such a conflict, we anticipate the termination of our representation in the area of the conflict and the continuation of our representation on other matters. We would not, in such a case, represent either party relative to any conflict between you. In other words, in the event of any conflict between you which would require the assistance of legal counsel, you would all be required to employ counsel other than ourselves or those in this firm.

If, after careful consideration of all the factors contained in this letter, you want [Hamer's law firm] to represent you with regard to these transactions, then you should sign the Consent attached to this letter, and have it witnessed and dated.

Attached to this letter was a consent form, which Paul and the borrowers signed. Hamer prepared a similar letter for one of the other loans, but this letter was never presented to Paul, and he did not sign it.

Paul discontinued private banking facilitated by Hamer because two of the loans "went south" in 2006 and 2007. The borrower on one loan defaulted in 2006. Paul understood the loan would be secured by a mortgage on real estate owned by the borrower. Paul instructed Hamer to seize the collateral. Hamer demurred. He told Paul the collateral was

not easily liquidated but offered to talk to the borrower "to straighten things out." After Hamer spoke with the borrower, the borrower caught up on overdue interest payments and then made occasional payments against the principal. The terms of the loan, however, were never formally modified in writing. The loan was eventually repaid in March 2009.

A borrower on a second loan defaulted in 2007. Paul understood that this loan was secured by an investment portfolio. Paul instructed Hamer to seize the portfolio. Hamer refused. Hamer advised Paul that Hamer could not take the action because the borrower was his client. Hamer told Paul that if Paul wished to pursue collection, he would have to seek other representation. Paul did not pursue other representation and eventually agreed to reduce the interest rate and extend the terms of the troubled loan. The troubled loan has since been extended multiple times and, as of Paul's 2013 complaint, about $350,000 remained unpaid. Under the new terms of the loan, the loan is scheduled to be paid in full in 2029.

**D. Paul's Loans to Hamer and Hamer-Owned Entities.** In addition to the loan that Paul made to Hamer's Quad Four, L.L.C., Paul made two other loans to entities that Hamer either owned or had an interest in—one in July 2004 and the other in March 2006. All of these loans were fully repaid as agreed.

**E. Paul and Hamer's Joint Investments in Platinum Exploration and Unified Worldwide Transport.** From 2004 to 2006, Paul and Hamer made joint investments in two entities, Platinum Exploration, Inc. (Platinum) and Unified Worldwide Transport, L.L.C. (UWT).

In July 2004, Paul invested almost $2,000,000 in Platinum, while Hamer invested $100,000 in the enterprise. Platinum, according to Paul, was a Texas oil exploration company that offered investments in a group of wells and guaranteed a recovery of the investment in twenty-four months through monthly payments. After the twenty-four months, the investor would be paid based on the profits of the wells.

Hamer introduced the Platinum investment to Paul. The monthly payments stopped after seventeen months because, according to Paul, the guaranteed payments were found to be illegal in Texas. A company that took over Platinum made a few more distributions and then collapsed.

Paul also invested about $4,500,000, and Hamer invested at least $600,000, in UWT. UWT purported to be a communications company involved with voice-over internet protocol with long-distance telephone contracts on the verge of a buyout but was later revealed to be a sham with no equipment or customers. UWT made a few small dividend distributions before it folded. Paul also loaned over $2,000,000 to UWT in 2005 and 2006. Hamer prepared the paperwork for the loan, including security agreements in UWT equipment. UWT defaulted on both loans.

Paul pursued legal action against UWT in California, eventually obtaining a judgment against the company. UWT, however, had no available assets. For his litigation efforts, Paul collected aggravation but no money.

**F. Paul's Complaint.** Paul filed a complaint with the Board on February 14, 2013. In the complaint, Paul accused Hamer of gaining his "unquestioning trust" and then abusing the relationship by representing the 2004 and 2005 private banking loans as being vetted and secured

when they were not. Paul alleged he suffered losses due to Hamer's abuse of the attorney–client relationship. Paul also accused Hamer of erratic billing and failing to promptly provide a detailed billing record on request.

The Board forwarded the complaint to Hamer and asked for a response. Hamer denied any wrongdoing, arguing Paul was a sophisticated client and understood the nature and risks of all of the transactions at issue.

**G. Board's Complaint.** The Board filed a complaint with the commission on September 30, 2015. The complaint included four counts with fifteen subdivisions alleging multiple violations of the pre-2005 code and post-2005 rules.[2]

Count I of the complaint concerned the loans between Paul and other Hamer clients. For the period before the adoption of our current disciplinary rules, the Board alleged violations of various provisions of the prior code. The Board alleged Hamer violated DR 5–105(B) and DR 5–105(C). These code provisions together forbid beginning and continuing the representation of multiple clients if the lawyer's "exercise

---

[2]Previously, when the Board has alleged violations of numerous rules but the core of the issue is really a violation of a single, significant rule, we have focused our attention on that key rule violation to the exclusion of the secondary rule violations that have tagged along. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Guthrie*, 901 N.W.2d 493, 498 (Iowa 2017) (noting the Board alleged violations of a number of ethical rules for trust account irregularities but the core of the issue was misappropriation of client funds and thus limiting analysis to misappropriation of client funds). Here, the core of the issue involved in Hamer's representation of both sides in financial transactions is conflict-of-interest violations. *See* Iowa Code Prof'l Responsibility DR 5–105(B)–(D); Iowa R. Prof'l Conduct 32:1.7(a)(2), (b). With respect to the transactions between Hamer and Paul, the core of the issue is also conflict-of-interest violations involving the attorney's own interests. *See* Iowa Code Prof'l Responsibility DR 5–104(A); Iowa R. Prof'l Conduct 32:1.8(a). Regarding the cash bonus for the sale of Buckle Down, the key issues are collecting a clearly excessive fee and engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. *See* Iowa Code Prof'l Responsibility DR 1–102(A)(4), DR 2–106(A). As in *Guthrie*, we will consider these alleged violations first, and upon finding violations of these code and rule provisions, we will not consider the other code and rule provisions charged. *See* 901 N.W.2d at 498–99.

of independent professional judgment on behalf of [one] client will be or is likely to be adversely affected by . . . represent[ing] another client. Iowa Code Prof'l Responsibility DR 5–105(B)–(C).

The Board also alleged a violation of DR 5–105(D). This code provision allows multiple representation only "if it is obvious that the lawyer can adequately represent the interest of each client and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's professional judgment on behalf of each." *Id.* DR 5–105(D).

For the period after the adoption of the rules, the Board alleged multiple violations parallel to those brought under the prior code. Specifically, the Board alleged Hamer's representations of Paul violated rule 32:1.7(a)(2). Under this rule, a lawyer is generally prohibited from representing a client when a concurrent conflict of interest involves "a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client." Iowa R. Prof'l Conduct 32:1.7(a)(2).

The Board also alleged a violation of rule 32:1.7(b). Under this rule, a lawyer may represent a client when there is a concurrent conflict of interest "if . . . the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client" and, among other things, "each client gives informed consent, confirmed in writing." *Id.* r. 32:1.7(b).

Count II concerned the loans that Paul made to Hamer or Hamer-owned entities. The Board alleged Hamer violated DR 5–104(A) during the period prior to the adoption of our current rules. This provision states that "[a] lawyer shall not enter into a business transaction with a client if they have differing interests . . . and if the client expects the

lawyer to exercise professional judgment [on the client's behalf] unless the client has consented after full disclosure." Iowa Code Prof'l Responsibility DR 5–104(A).

The Board also alleged a violation of rule 32:1.8(a). This provision states that

> [a] lawyer shall not enter into a business transaction with a client or knowingly acquire . . . [a] pecuniary interest adverse to the client unless . . . the transaction and terms . . . are fair and reasonable to the client[;] . . . are fully disclosed and transmitted in writing . . . [to] the client; . . . the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel . . .; and the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction.

Iowa R. Prof'l Conduct 32:1.8(a).

Count III concerned the joint investments Hamer and Paul made in Platinum and UWT. In this count, the Board also alleged violations of DR 5–104(A) and rule 32:1.8(a).

Finally, in count IV, the Board alleged ethics violations in connection with the undisclosed bonus Hamer included in his unitemized bill to Paul for legal services. The Board alleged, among other things, that Hamer violated DR 1–102(A)(4), which prohibits lawyers from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa Code Prof'l Responsibility DR 1–102(A)(4). The Board also alleged that Hamer violated DR 2–106(A), stating lawyers shall not collect a "clearly excessive fee." Id. DR 2–106(A).

**H. Hamer's Response.** Hamer filed a response on April 22, 2016. Hamer admitted the transactions occurred but denied any conflict of interest, failure to disclose, or lack of consent on Paul's part.

Specifically, Hamer agreed he offered Paul the private financing opportunities at issue. Hamer denied allegations of conflict of interest

and allegations he did not fully disclose to Paul the multiple representations and their potential effects. Hamer denied failing to explain to Paul how independent counsel might address Paul's interests differently and asserted

> although he most certainly did not have a discussion detailing how each and every possible other "counsel" may have approached Paul's interests, Respondent did not conflict with Paul's interest in any way and a complete disclosure of the circumstances was made to Paul upon which Paul could, and did, make an informed decision—as he always did and this included discussions of independent counsel.

Hamer denied telling Paul the loans would be fully secured with adequate collateral. Hamer agreed he never took steps to perfect Paul's security interests but denied that this was ever intended to be his responsibility. He stressed the decisions whether to make the loans were solely Paul's and Paul undertook the decisions with complete disclosure.

With respect to the joint investments, Hamer denied that his and Paul's interests were inconsistent with or diverse from each other. Hamer further denied that he failed to make necessary disclosures to Paul or failed in his duty to Paul.

With respect to the bonus and loan related to the sale of Buckle Down, Hamer asserted Paul agreed to pay Hamer the cash bonus that Hamer collected. Hamer denied that Paul repeatedly asked Hamer for a detailed statement of the legal fees associates with the Buckle Down sale or that Hamer repeatedly promised to provide the detailed statement but did not do so until February 2010. Hamer agreed he never made any disclosures in writing to Paul related to the loans to him or entities he owned but denied that this was improper and asserted that all parties accepted the terms of the loan.

**I. Grievance Commission Hearing.** From March 14–16, 2017, the commission held a hearing in the matter. The Board called one witness, Paul, and admitted over 500 pages of exhibits. Hamer called one witness, himself, and admitted over 1700 pages of exhibits.

Paul was the first witness. Paul described how, after the sale of Buckle Down, he had engaged in private banking with individuals and businesses that were also Hamer's clients. The Board asked Paul in detail about every loan at issue. The Board often showed Paul the loan instruments, and Paul explained what Hamer communicated about the loans, which was very limited information. Paul asserted that generally he did not know that the other parties in the transactions were other Hamer clients. Some of the loan instruments included language such as "[t]his Note is to be fully secured and guaranteed." Paul explained that in the case of one loan, Hamer told him that the loan would be secured and guaranteed by collateral consisting of "spec houses" because the borrower was a realtor and that Hamer would take care of the collateral. Paul also explained what he believed to be the collateral or security interests in other loans. Paul said Hamer never told him that Paul would be responsible for ensuring that Paul's interests in the collateral or security interests were perfected. Paul also reported Hamer did not communicate to him anything about the effect of multiple-client representations, other than what was said in the single multiple-client representation letter that he received and signed in only one of the transactions.

On the subject of the market-value loans to Hamer, Paul related that Hamer requested several loans in 2004 and 2005 for business entities that Hamer either owned or had an ownership interest in. Paul reported that Hamer did not disclose any financial information about the

business entities, that a conflict of interest might affect Hamer's professional judgment, or that Paul should seek independent counsel.

The Board asked about the investments in Platinum and UWT. Paul stated Hamer told him about Platinum, and they along with others, jointly invested in the business. Paul reported Hamer told him that he—Hamer—had studied Platinum's financial information. Hamer, Paul claimed, indicated the business was financially solid, had an excellent reputation, and therefore was a low-risk investment. Paul said Hamer did not disclose that Hamer's professional judgment would be impaired by Hamer joining Paul in the investment or that Paul should seek independent counsel.

On the subject of UWT, Paul testified he learned about the investment from Hamer, UWT's CEO, and a UWT selling agent. Paul described Hamer as a conduit of information about the investment—Hamer did not generate any of the information, but Hamer would receive information from UWT and pass it along to Paul. Paul, Hamer, partners in Hamer's law firm, and other clients of Hamer jointly invested in UWT. As with Platinum, Paul claimed Hamer did not disclose that Hamer's professional judgment would be impaired by Hamer joining Paul in the investment or that Hamer should seek independent counsel. Paul also said Hamer told him the risks of investing in UWT would be low, based on UWT's representation that the business was about to be sold.

After making several investments in and loans to UWT, Paul, Hamer, and the other investors discovered UWT was a fraud. Paul, Hamer, and many other investors sued UWT to recover their investments. They received a judgment in their favor but recovered nothing. Paul explained that the people behind UWT were criminally prosecuted for the fraud and were currently in federal prison.

Concerning the bonus, Paul testified that he was very pleased with the sale of Buckle Down. Paul said that he wanted to give Hamer a bonus of $150,000. According to Paul, Hamer said a cash bonus was problematic because Hamer would be required to share the bonus with the other law firm partners. Instead of a cash bonus, Hamer asked Paul to offer him a $1,000,000 loan over five years at three percent less than he would pay elsewhere, which would yield $30,000 a year. This would not have to be shared with the partners, Hamer reportedly told Paul. Paul said he agreed to the loan.

Paul reported Hamer later told him the legal fees for the Buckle Down sale would be about $268,000. Paul paid the fees and received a single sheet, unitemized bill. Paul said when he paid the fees, he did not understand he was paying Hamer a bonus. Paul described repeatedly requesting over a period of five years an itemized bill which he ultimately receive in February 2010. When Paul received the itemized bill, he learned he had paid Hamer a double bonus, which Paul insisted was contrary to their agreement.

On cross-examination, Hamer's attorney dug into Paul's testimony in detail. Of particular note, Hamer's attorney asked Paul if the bonus Paul suggested was in fact $110,000 and not $150,000. The attorney pointed out that in a deposition, Paul said he had proposed a $110,000 bonus. Paul explained he misspoke in the deposition but promptly, in the next paragraph of the deposition, corrected himself and said it was not that amount. He reported $110,000 was in his mind because he was reviewing the documents prior to the deposition and $110,000 was the amount on the note attached to the check copy.

Hamer's lawyer further questioned Paul about the amount of the proposed bonus, reading from the deposition that Paul had then said, "I

think initially I proposed $250,000, but I don't have any notes on the whole thing." Paul replied that the value of the amount he was giving Hamer in the loan depended on, from Paul's perspective, the interest rate he could get for the loan in the market. If Paul could have gotten 7.5%, he said, then he would have been giving Hamer a five point break which would result in a gift of $250,000 over five years. Hamer's lawyer accused Paul of making up bogus mathematical formulae to try to support Paul changing the number, but Paul denied this.

Hamer then testified on his own behalf. With respect to the loans to his other clients, Hamer testified to his version of events. He emphasized Paul's sophistication and business acumen and claimed he did speak with Paul about multiple-client representation. He testified he was sure Paul knew the borrowers were his clients. Hamer insisted he never gave investment advice to Paul and Paul researched all the details of the investments and independently made his own decisions. Hamer just presented business opportunities to Paul. Hamer pointed out Paul made "well over a million dollars" from the private loans that Hamer presented to Paul in 2005 and 2006. Throughout, Hamer maintained he had not abused Paul's trust or committed any ethical improprieties in these transactions.

A commissioner questioned Hamer about some of the loan instruments referring to the transactions as being "secured." The commissioner asked Hamer whether he ever told Paul of the necessity of perfecting his security interest, because otherwise it would be fair for Paul to expect those sort of loose ends to be taken care of by his attorney. Hamer replied,

> What I testified to a little bit earlier was a comfort level—I think I used that term. In these transactions where I was bringing them to him, it was important that he have a

comfort level with the people, with the situation, and with the transaction, itself. He looked at these transactions very carefully, each one of them. He looked at them, and if he directed that I do something, I did it; if he didn't, I didn't. When you are in a situation when you have a conflict of this sort, as [I] understood the rules then and followed the rules, I was bringing it. I didn't negotiate. He said I negotiated; I couldn't negotiate.

The commissioner pressed, asking whether at any time he told Paul that, for Paul's own protection, Paul needed to perfect the security interest because if something went wrong there would be a much higher risk of loss. Hamer replied he had discussions with Paul about the attorney–client relationship and conflicts, and he emphasized that Paul was a sophisticated investor who had done UCC transactions before.

The commissioner asked if Hamer considered Paul to be on his own in perfecting the security interests without Hamer's assistance. Hamer replied,

Not necessarily. In some cases he wasn't. I didn't expect that he would or wouldn't. . . . I mean, we had 22 transactions, and in those 22 transactions, 21 of them paid back as he expected, as we expected. And the one that we didn't, the security was there . . . What [Paul] thought he got, he got.

Hamer confirmed he did not prepare any security agreements; advise Paul to have a security agreement prepared; advise Paul to request mortgages on properties; or prepare or advise Paul to have prepared the personal guarantees, when those were mentioned in the loan instrument. Hamer stated, "Knowing the individuals involved, and given the fact that I was signing off on this as the signatory on this, the security in many respects, in my mind, was myself."

Hamer also described the circumstances of the market-value loans that Paul made to entities Hamer owned or had an ownership interest in.

He stressed these were paid back early or on time. Hamer concluded these were successful transactions for Paul.

Concerning the joint investments, Hamer testified he personally lost $2,250,000 in UWT and Platinum. He never recovered any money from the lawsuit against UWT. Hamer believed the origin of Paul's complaint was the revelation that UWT was a scam, which hurt both Hamer and Paul. Hamer suggested Paul manufactured these claims out of anger at Hamer over the failed investments. Hamer described the scam perpetrated by UWT as "incredibly sophisticated," noting many other investors were bilked by UWT and the people responsible for UWT were federally prosecuted for their crimes.

On the subject of the bonus, Hamer stressed there was only one bonus, which was a cash bonus of $110,000 and Paul proposed this amount. The $1,000,000 loan at 2.5% was an ordinary loan, and the interest rate was Paul's idea and was not suggested by Hamer. When questioned why the interest rate on that loan was so much lower than the other loans that Paul made to Hamer and Hamer's clients, Hamer said he could not explain why Paul did what he did, but Hamer saw the low rate as a gift.

With respect to mitigating factors, Hamer described the numerous community activities in which he participated. This list included coaching, parent–teacher associations and other school groups, various religious groups and other nonprofits, and the Iowa City Community Theater and other community organizations. Hamer also indicated he had reduced his practice and was in the process of winding it down because of health problems which began in 2015.

**J. Grievance Commission Findings, Conclusions, and Recommendation.** In the commission's findings of fact, conclusions of

law, and recommendation, the commission noted it found both Hamer and Paul lacked credibility[3] "in at least portions of their testimony at the hearing." As a result, it held the Board failed to establish by a convincing preponderance of the evidence that Hamer never informed Paul that the borrowers in the transactions were also Hamer's clients.

The commission nevertheless found Hamer violated all of the code and rule violations described above, except in count III with respect to the joint investments. There it found inconsistencies in Paul's testimony about his reliance on Hamer for investment advice, communications with UWT, and negotiations. The commission noted Paul had contact with UWT's CEO and broker, reviewed investment materials, and negotiated some of the terms on the Platinum investment. Hamer did not originate the UWT information that Paul considered when deciding whether to invest in UWT.

For mitigating circumstances, the commission recognized Hamer had no record of prior disciplinary actions and had cooperated with the Board's investigation. Hamer also engaged in community and volunteer activities. Finally, the commission noted all of the loans Paul made to Hamer's clients except one had been repaid.

For aggravating circumstances, the commission noted that while each violation was not great in and of itself, collectively they warranted a severe sanction because they showed Hamer either did not understand the nature of his actions or did not believe the actions were violations of the rules. The commission observed violations of multiple ethical rules

---

[3]A finder of fact is free to credit some testimony of a witness while discounting other testimony from the same witness. *Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 468 (Iowa 2000); *see also In re Askew*, 96 A.3d 52, 60 (D.C. 2014). Further, finding some testimony not credible does not necessarily mean finding that the witness was being deliberately dishonest—a witness could be simply mistaken, for example. *See Aden v. Holder*, 589 F.3d 1040, 1045 (9th Cir. 2009).

and a pattern of conduct occurring over years warranted increased disciplinary sanctions. The commission found Hamer was an experienced attorney and this was an aggravating factor to be considered. Finally, the commission found Hamer's misconduct reflected poorly on the legal profession as a whole, requiring a suspension to penalize the lawyer and deter others.

Based on all the facts and circumstances, the commission recommended a six-month suspension.

## II. Standard of Review.

We review commission reports de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kieffer-Garrison*, 847 N.W.2d 489, 492 (Iowa 2014); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 366 (Iowa 2005). We give weight to the factual findings of the commission, especially with respect to witness credibility but are not bound by the commission's determinations. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Blessum*, 861 N.W.2d 575, 582 (Iowa 2015). The Board has the burden of proving attorney misconduct by a convincing preponderance of the evidence. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bowles*, 794 N.W.2d 1, 3 (Iowa 2011).

"Although we respectfully consider the discipline recommended by the [c]ommission, the final decision on the appropriate sanction is for this court." *Kieffer-Garrison*, 847 N.W.2d at 492 (quoting *Howe*, 706 N.W.2d at 366).

## III. Conflicts of Interest Between Current Clients.

**A. Positions of the Parties.** Hamer argues the Board has failed to prove any violation of attorney ethics under the code or the rules. He emphasizes the rules for ethical conduct do not prevent multiple-client representation when two or more clients have exceedingly similar or

aligned interests. Here, he argues, all parties had similarly aligned interests in the private loans and there was no likelihood Hamer would be subject to adverse influences affecting his independent judgment on behalf of each client. He asserts he made appropriate disclosures to all clients and received informed consent.

The Board argues Hamer violated numerous rules in the transactions between Paul and other clients. The Board contends Hamer violated DR 5–105(C) and (D) in initiating and arranging loans between Paul and other clients. Hamer represented both creditor and debtor in commercial transactions. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 728–29 (Iowa 1999) (noting disclosure of dual representation and detailed nature of conflicts required in large commercial transaction). The Board argues although Hamer allegedly told Paul the borrowers were clients, Hamer never said he explained the pitfalls that might arise in the transaction that would make it desirable for Paul to obtain independent counsel. Although Hamer testified he strove to make disclosures to his clients to achieve a mutual comfort level for them to proceed with the transaction, the Board contends the multiple-client disclosure letter that Paul signed for one of the loans was inadequate. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clauss*, 711 N.W.2d 1, 2–4 (Iowa 2006).

With respect to the loan occurring after July 2005, the Board argues Hamer violated rule 32:1.7(a)(2), (b). Hamer never obtained Paul's informed consent in writing as required by the rule. While Hamer provided a multiple-client representation letter, Paul never saw this. Further, Hamer did not advise Paul that confidential communications from Paul would be shared with the other client and vice versa.

**B. Required Disclosures for Informed Consent in Conflict-of-Interest Representations Between Clients.**

1. *Under the code.* The Iowa Code of Professional Responsibility for Lawyers DR 5–105(B) provides,

> (B) A lawyer shall decline proffered employment if the exercise of independent professional judgment on behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(D).

Additionally, DR 5–105(C) states,

> (C) A lawyer shall not continue multiple employment if the exercise of independent professional judgment on behalf of a client will be or is likely to be adversely affected by the representation of another client, except to the extent permitted under DR 5–105(D).

*Id.* DR 5–105(C).

Finally, the exception to the above provided in DR 5–105(D) reads,

> (D) In the situations covered by DR 5–105(B) and DR 5–105(C), a lawyer may represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each.

*Id.* DR 5–105(D).

For full disclosure under DR 5–105(D), the Iowa Supreme Court has said that it requires the

> attorney not only to inform the prospective client of the attorney's relationship with the [other party], but also to explain in detail the pitfalls that may arise in the course of the transaction which would make it desirable that the buyer obtain independent counsel.

*Wagner,* 599 N.W.2d at 728 (quoting *In re Dolan,* 384 A.2d 1076, 1080 (N.J. 1978)). We spoke further of the level of detail that is required to make full disclosure:

> [A full disclosure] requires a detailed explanation to the client of all possible areas where the interest of one client may differ from that of the other. The burden is upon the lawyer to raise all possibilities. A simple recitation of the applicable law is inadequate. An explanation of the applicable law to every possible factual situation is essential.

*Id.* at 729 (alteration in original) (quoting Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct Formal Opinion, No. 79-19).

In *Wagner,* an attorney represented both the buyer and the seller in a real estate transaction. *Id.* at 724–25. This triggered a duty of full disclosure in order for the attorney to get informed consent. *Id.* at 728. The attorney, however, only told the clients about the possibility of a conflict, but did not advise what possible conflicts might arise and why independent counsel was advisable. *Id.* at 729. The attorney's disclosures were, therefore, inadequate. *Id.* The client was harmed, the court explained, by not having the opportunity for representation by a truly independent counsel who could have better protected the client's interest in the transaction. *Id.* The fact that the attorney did not negotiate the purchase price between the parties did not eliminate the conflict of interest. *Id.* at 726. The attorney thus violated DR 5–105(B)–(D). *Id.* at 729.

In *Clauss,* an attorney represented both a landlord and a renter in the collection and payment of past-due rental fees. 711 N.W.2d at 2. The attorney attempted to obtain a waiver of the conflict, sending a letter to both, which they both signed, simply stating the attorney was asking them to wave the conflict and the other client had no problems under the circumstances. *Id.* The *Clauss* court held these were not valid waivers of conflict under DR 5–105(D). *Id.* at 3. Importantly, the attorney's letter lacked a "full disclosure of the possible effect of such representation on

the exercise of the lawyer's independent professional judgment on behalf of each." *Id.* at 3 (quoting DR 5–105(D)).

2. *Under the rules.* Rule 32:1.7(a) reads,

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

Iowa R. Prof'l Conduct 32:1.7(a)(1)–(2). Rule 32:1.7(b) states,

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

*Id.* r. 32:1.7(b)(1)–(4).

We recently heard *Iowa Supreme Court Attorney Disciplinary Board v. Willey*, 889 N.W.2d 647 (Iowa 2017). In *Willey*, the attorney Willey had two clients, Wild and Wieniewitz. *Id.* at 650. Wild was the president of a company called Synergy. *Id.* When Willey learned that Wieniewitz was interested in investment opportunities, Willey offered an investment in Synergy and arranged the investment in the form of a loan. *Id.*

Wieniewitz denied that Willey told him that Wild and Synergy were Willey's clients. *Id.* All communication about the loan went through Willey. *Id.* Willey never obtained informed consent from Wieniewitz nor confirmed in writing any potential conflict of interest with Wild and Synergy. *Id.* at 651. Willey did not recommend Wieniewitz consult with independent counsel. *Id.* Wieniewitz never received any of the promised payments for the investment, which was supposed to be repaid within forty-five days with additional payments to follow. *Id.* at 650–51. Willey repeatedly assured Wieniewitz there was only a short delay and payments would be made within a week. Willey made such assurances frequently for over a year and a half. *Id.* at 652.

In determining whether there was a conflict of interest under rule 32:1.7(a)(2), we explained that we use a two-step approach to determine whether an attorney violated the rule. *Id.* at 653. We first decide whether the lawyer's representation of one client was affected by his or her "responsibilities to another client, a former client, or a third person." *Id.* (quoting Iowa R. Prof'l Conduct 32:1.7(a)(2)); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stoller*, 879 N.W.2d 199, 207 (Iowa 2016). If the answer to this is yes, we then determine whether the attorney's "representation of one client was materially limited by his [or her] representation of another." *Willey*, 889 N.W.2d at 653. We noted comment 8 to rule 32:1.7 states,

> Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.

*Id.* (quoting Iowa R. Prof'l Conduct 32:1.7 cmt. 8). We stressed

> [t]he key questions a lawyer must ask are whether it is likely a difference in interests will occur between the clients and, if

so, whether that difference in interests will interfere with the lawyer's ability to offer independent, professional judgment to each client.

*Id.* at 653–54.

We held there was a concurrent conflict of interest. *Id.* at 656. The interests of Wieniewitz, who loaned the money, and Synergy and Wild, the borrowers, "were at odds from the beginning." *Id.* Willey's representation of Wieniewitz was materially limited because Willey was unable to adequately pursue Wieniewitz's interest in obtaining the return of his original investment—Willey only forwarded information from one client to another and did nothing to protect Wieniewitz. *Id.* We also held Willey failed to obtain informed consent, confirmed in writing, from Wieniewitz before continuing to represent both parties in the transaction. *Id.*

**C. Discussion.** First, considering the transactions between Paul and other Hamer clients that occurred before July 2005, we hold the Board has shown by a convincing preponderance of the evidence that Hamer violated Iowa Code of Professional Responsibility for Lawyers DR 5–105(B)–(D). For later conduct, we also hold the Board has shown Hamer violated Iowa Rule of Professional Conduct 32:1.7(a) and (b) by a convincing preponderance of the evidence.

Under both the code and the rules, the Board must show there was a concurrent conflict of interest between Paul and the other Hamer clients in order to trigger Hamer's duty of obtaining informed consent from Paul and the other clients, after full disclosure. The Board has done this by showing that Hamer represented Paul as the lender and the other clients as the borrowers in the private loans. As we explained under similar circumstances in *Willey*, there was a concurrent conflict of interest when Hamer represented both the lender Paul and the borrowers

because the interests of Paul and the borrowers "were at odds from the beginning." 889 N.W.2d at 656.

In attempting to argue there was no conflict of interest between Paul and the borrowers, Hamer stressed Paul and the borrowers had similarly aligned interests. This is simply wrong. While it is generally true that both lenders and borrowers have an interest in successfully completing the loan transaction, lenders and borrowers have conflicting interests at the initiation of the transaction in obtaining favorable terms. It hardly needs to be said that a term that is a favorable term for the borrower tends to be an unfavorable term for the lender and vice versa.

Hamer also stresses he performed no negotiations on behalf of either Paul or the lenders, but as we noted in *Wagner* in the context of a real estate transaction, the fact that an attorney does not perform any negotiations between the parties does not eliminate the conflict. 599 N.W.2d at 726. Borrowers and lenders may also have conflicting interests throughout the transaction, particularly when the borrower encounters difficulties in repaying the loan, as happened here in at least two of the loans described in the complaint.

The code and the rules have slightly different requirements for informed consent, and so whether Hamer obtained informed consent from Paul must be analyzed separately under the code and the rules.

Under DR 5–105(B)–(D), unlike under rule 32:1.7(a) and (b), the client's informed consent need not be confirmed in writing. Here, we have conflicting testimony from Hamer and Paul about the nature and type of disclosures that Hamer orally made to Paul about the conflict. While we agree with the commission's findings of credibility with respect to Hamer and Paul, even assuming that we completely credit Hamer's testimony about the disclosures he made, we would still find that Hamer

failed to fully disclose to Paul the possible effect of representing both Paul and the borrower on the exercise of Hamer's independent professional judgment on Paul's behalf. *See Clauss,* 711 N.W.2d at 3.

We note that in Hamer's response to the Board's complaint, Hamer repeatedly asserted that "he most certainly did not have a discussion detailing how each and every possible other 'counsel' may have approached Paul's interest." While the code does not require Hamer to have disclosed how "each and every possible" independent counsel might approach his or her representation of Paul, the code does require Hamer have disclosed how an unconflicted attorney would be better able to represent Paul's interests than Hamer with respect to the transactions at hand. At the very least, Hamer's disclosure should have included how an unconflicted attorney would be able to represent Paul in the event of the borrower defaulting on the loan—which, of course, is one of the most obvious events that could happen in a loan and that any competent attorney must envision as a possibility. In addition, an unconflicted attorney representing the lender in a loan transaction would carefully examine available collateral, advise the client of potential remedies in the event of default, and ensure any security interests supporting the loan were properly perfected. We further note the one time that Hamer provided Paul with a multiple-client representation letter, this letter, while somewhat lengthy, failed to provide the required specific, in-context assessment of the pitfalls that might arise in the course of the loan that would make it desirable that Paul obtain independent counsel. *See Wagner,* 599 N.W.2d at 728.

With respect to the transaction that occurred after July 2005, it is undisputed that Hamer did not obtain informed consent from Paul confirmed *in writing* as required by rule 32:1.7(b). We note that Hamer

prepared a multiple-client representation letter and consent form for this transaction, but this letter was not signed by Paul. We further credit Paul's testimony that he was not contemporaneously presented with the letter. Even if Paul had signed this consent form, as we explained above with respect to the prior, similar informed-consent letter, this letter was insufficient to serve as full disclosure because, at the very least, it lacked a specific discussion of the potential pitfalls involved in the transactions at hand.

For the above reasons, we conclude the Board proved by a convincing preponderance of the evidence that Hamer repeatedly violated DR 5–105(B)–(D) and rule 32:1.7(a) and (b).

**IV. Conflicts of Interest Between Attorney and Client: Loans and Joint Investments.**

**A. Positions of the Parties.** Hamer argues the loans he entered into with Paul were standard commercial transactions because of Paul's expertise and experience as a private banker. In a comment to Iowa Rule of Professional Conduct 32:1.8, if a client offers standard commercial transactions for products and services, including banking or brokerage services, then "the lawyer has no advantage in dealing with the client, and the restrictions in [rule 32:1.8(a)] are unnecessary and impracticable." Iowa R. Prof'l Conduct 32:1.8 cmt 1. Hamer asserts Paul was engaged in private banking and was an expert in it, and thus the loans fall squarely within the standard commercial transaction exception to the rule. *See generally Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 841 N.W.2d 114, 122–23 (Iowa 2013) (discussing standard commercial transaction exception to rule 32:1.8(a)).

The Board argues that Hamer violated numerous code provisions and rules in arranging loans between Paul and entities that Hamer

owned or an ownership interest in. First, the Board argues Hamer violated DR 5–104(A) for the million dollar "bonus" loan between Paul and Hamer's company Quad Four, L.L.C. in July 2004.

The Board also asserts the July 2004 loan to Quad Four, L.L.C. violated DR 5–101(A). *See Clauss,* 711 N.W.2d at 3–5 (representing judgment creditor and judgment debtor simultaneously). Hamer accepted employment when his own interests impaired or may have impaired his independent professional judgment by borrowing money from Paul and becoming one of Paul's debtors.

**B. Required Disclosures for Informed Consent in Conflict-of-Interest Representations Between Attorney and Client.**

1. *Under the code.* Iowa Code of Professional Responsibility for Lawyers DR 5–101(A) states,

> (A) Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of the lawyer's professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests.

DR 5–104(A) states,

> (A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

*Id.* DR 5–104(A).

In *Committee on Professional Ethics & Conduct v. Mershon,* 316 N.W.2d 895 (Iowa 1982), an attorney formed a corporation with his client named Miller and a third individual named Schenk, who was not a client. *Id.* at 896–97. When Miller died, the attorney and Schenk disputed the ownership of the corporation. *Id.* at 897. The question before the court

was whether the evidence showed the attorney violated DR 5–104(A), prohibiting business transactions with clients when there is a conflict, unless the client has consented after full disclosure. *Id.*

The *Mershon* court explained,

> In order to establish a violation of DR 5–104(A) it is necessary to show that the lawyer and client had differing interests in the transaction, that the client expected the lawyer to exercise his professional judgment for the protection of the client, and that the client consented to the transaction without full disclosure.

*Id.* at 898. The court noted that there was no dispute that the attorney and Miller had differing interests in the transaction and that Miller relied on the attorney to exercise his professional judgment to protect him. *Id.* The fighting issue was whether the attorney made full disclosure to Miller. *Id.* at 898–99.

The court held that because a fiduciary relationship exists, an attorney

> has the burden of showing that the transaction "was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger."

*Id.* at 899 (quoting *Goldman v. Kane,* 329 N.E.2d 770, 773 (Mass. App. Ct. 1975)). Thus, because the record did not show that the attorney made a full disclosure to Miller before Miller consented to the transaction, a violation of DR 5–104(A) was established. *Id.* at 900.

Since *Mershon*, we have regularly confirmed that "when an attorney engages in business transactions with a client involving conflicting interests, the burden is on the attorney to show that he acted in good faith and made full disclosures." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wintroub*, 745 N.W.2d 469, 474 (Iowa 2008); *see also Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sikma*, 533 N.W.2d 532, 535–36 (Iowa 1995); *Smith v. Bitter*, 319 N.W.2d 196, 198 (Iowa 1982) (emphasizing the "harsh and demanding responsibilities of an attorney" in a business relationship with clients). If the record fails to affirmatively show the client was fully advised about the facts and legal consequences of a transaction that are necessary to make an intelligent decision, there is an ethical violation. *Wintroub*, 745 N.W.2d at 474.

2. *Under the rules.* Rule 32:1.8(a) provides,

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless:

> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

Iowa R. Prof'l Conduct 32:1.8(a)(1)–(3). Comment 1 to rule 32:1.8 states

> the rule does not apply to standard commercial transactions between the lawyer and the client for products or services that the client generally markets to others, for example, banking or brokerage services, medical services, products manufactured or distributed by the client, and utilities' services. In such transactions, the lawyer has no advantage

> in dealing with the client, and the restrictions in paragraph (a) are unnecessary and impracticable.

*Id.* r. 32:1.8 cmt 1.

**C. Discussion.** We first address Hamer's argument that the commission erred in requiring him to affirmatively show he fully disclosed the conflict of interest to Paul. Hamer is incorrect under our longstanding precedent described above. Once the Board shows an attorney engaged in business transactions with a client and they had conflicting interests, the burden shifts to the attorney to show good faith and full disclosure. If the attorney cannot affirmatively show this, the attorney has violated the code or the rules.

The fact that an attorney's disclosure requirements are "harsh and demanding," and that our rules require the attorney to demonstrate good faith and full disclosure at a disciplinary hearing, serves to remind attorneys to be very careful when engaging in these type of transactions. *See Smith*, 319 N.W.2d at 198. While the code and the rules allow a client to waive the conflict of interest, the onerous burden of ensuring documentary evidence of good faith and full disclosure should make such business transactions the exception rather than the rule. A client simply cannot waive the conflict as a matter of informal routine. The disclosure must include a detailed, situation-specific discussion of the ways that are reasonably foreseeable in which the attorney's conflict could potentially impact that particular client with that particular conflict, along with all of the other required disclosures including how confidential information will be handled.

With respect to the loans between Paul and Hamer, we find Hamer has failed to meet his burden of showing that he obtained Paul's informed consent for the transactions. We wish to stress the loans

between Paul and Hamer were not standard commercial transactions. While Paul and Hamer may have termed Paul's loans "private banking," they bear little resemblance to actual banks and their lending practices. For example, borrowers did not need to fill out any forms for Paul or disclose their financial information. Paul did not run a credit check on the borrowers prior to lending them money.

Because the loans between Paul and Hamer were not standard commercial transactions, and because Hamer has not shown that Paul was advised of the need to seek independent legal counsel or that he gave informed consent to the terms of the transaction and the lawyer's role in the transaction, we find Hamer violated DR 5–101(A), DR 5–104(A) and rule 32:1.8.

With respect to Paul and Hamer's investments in Platinum and UWT in count III, the commission found the Board had failed to show Hamer violated the code and rule provisions. The commission found Paul was not credible when he testified that he relied upon Hamer for investment advice in Platinum and UWT. The commission found Paul reviewed investment information material from Platinum and UWT, negotiated with Platinum, and had personal contact with individuals at UWT. In short, the commission found the record did not establish Paul's reliance on Hamer for advice in connection with what turned out to be bad investments. The Board on appeal does not contest the commission's approach. We find no reason to disturb the commission's conclusion regarding Platinum and UWT.

### V. Excessive Fee and Dishonest Conduct: The Bonus.

**A. Positions of the Parties.** Hamer argues the commission erred in finding that Hamer collected an excessive fee for his role in the sale of Buckle Down. First, Hamer reasserts Paul's testimony was totally

lacking in credibility. Hamer points to Paul's inconsistency about the amount of the bonus he claimed he originally proposed, whether $250,000, $150,000, or $110,000. Hamer claims the testimony that he declined the cash bonus and proposed a $1,000,000 loan at 2.5% was completely fabricated, motivated by Paul's desire to hurt Hamer. Finally, Hamer argues the total fee was not excessive because the sale of Buckle Down was highly technical and required Hamer's advanced legal expertise for work that spanned six years.

The Board argues Hamer violated DR 1–102(A)(4) and DR 2–106(A) in collecting two bonuses for the sale of Buckle Down, one cash bonus of $110,000 that Paul did not know about and one discounted-interest bonus on a $1,000,000 loan to which Paul had agreed. The Board argues it has met its burden to show Hamer's intent for the charge of misconduct under DR 1–102(A)(4) because Hamer withheld the itemized bill for Buckle Down from Paul until long after Hamer obtained the loan. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kress*, 747 N.W.2d 530, 538 (Iowa 2008) (establishing the Board's duty to show intent). The natural and logical consequences of delaying the bill's release to Paul was to intentionally mislead Paul and dishonestly obtain a second bonus through the low-interest-rate loan.

**B. Discussion.** The resolution of disciplinary issues surrounding the bonus issue depends on credibility determinations. If Paul's version of events surrounding the bonus issue is believed, Hamer would face at least two potential disciplinary problems. First, it would be improper for Hamer to secure a preferential loan from Paul, which would inure solely for Hamer's personal benefit, in lieu of a cash bonus for Hamer's work on the Buckle Down transaction, which would be paid to Hamer's law firm. We have condemned the diversion of fees owed to a firm into a lawyer's

personal account on numerous occasions. *See State v. Henrichsen*, 825 N.W.2d 525, 527–28 (Iowa 2013). But the Board did not charge Paul with a *Henrichsen*-type violation. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 536 n.2 (Iowa 2013) (noting that finding an attorney in violation of a rule not charged by the Board would deprive the attorney of procedural due process).

Instead, the Board charged Hamer with ethical violations in connection with the payment of what Paul characterizes as an unauthorized, double bonus that was included in the unitemized fee statement that Hamer presented to Paul for his work in the Buckle Down transaction. In his brief, Hamer notes that if the facts were as alleged by Paul, it would amount to theft. Iowa Code of Professional Responsibility for Lawyers DR 1–102(A)(4) prohibits a lawyer from "[e]ngag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation." To prove a violation of DR 1–102(A)(4), the Board must show the attorney intentionally engaged in fraud, dishonesty, or deceit. *Kress*, 747 N.W.2d at 538. Intent is shown for the purpose of a disciplinary proceeding "where the evidence shows that the actor intends the natural and logical consequences of his or her acts" by a convincing preponderance of the evidence. *Id.*

On the factual question of whether Hamer charged an unauthorized double bonus in his unitemized fee statement, we note several features of the record. On the one hand, Hamer has no explanation as to why Paul would extend the $1,000,000 loan to him at the very low rate of 2.5% annual interest. The interest rate on the loan was far below the interest rate Paul received on other loans, including a later loan to Hamer. Further, why did it take Hamer five years to disclose to Paul that an $110,000 bonus was contained within the

unitemized fee statement? On the other hand, Paul did not mention the double-bonus problem in his original complaint filed with the Board. If Paul had, in fact, paid an unauthorized second bonus of $110,000, one would expect this to be included in an ethics complaint filed with the Board.

The commission found the facts on the double bonus adversely to Hamer. We ordinarily give deference to the fact finding of the commission on questions where the credibility of witnesses is involved. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Moothart*, 860 N.W.2d 598, 602 (Iowa 2015). Based on the cold record, it is difficult to determine whether there was a double bonus or whether there was simply some kind of misunderstanding between Paul and Hamer. At a minimum, however, we think Hamer acted deceitfully when he presented Paul with an unitemized bill with an undisclosed substantial bonus and refused to provide him with an itemization for five years. We thus think the Board proved a violation of DR 1–102A(4) by a clear and convincing preponderance of the evidence.

**VI. Sanction.**

**A. Positions of the Parties.** Hamer argues that no sanction should be imposed. If we do impose a sanction, however, Hamer asserts that his involvement in the community, including pro bono work and volunteering, is a significant mitigating factor.

The Board requests that we impose an "appropriate disciplinary sanction" against Hamer. It draws our attention to the following aggravating factors: a pattern of misconduct, multiple offenses, refusing to acknowledge the wrongful nature of the conduct, harm to the client, and Hamer's substantial experience in the practice of law.

**B. Appropriate Sanction.** We now turn to the issue of the appropriate sanction. We individually craft an appropriate sanction for each case in light of its particular circumstances. *Dolezal*, 841 N.W.2d at 127.

> In determining the appropriate discipline, we consider the nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole, and the respondent's fitness to continue in the practice of law, as well as any aggravating and mitigating circumstances.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marks*, 831 N.W.2d 194, 201 (Iowa 2013) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cannon*, 821 N.W.2d 873, 880 (Iowa 2012)).

In *Willey*, we imposed a suspension of sixty days for one instance of an attorney representing both sides in a loan without first obtaining informed consent from both parties. 889 N.W.2d at 658. In *Wagner*, we imposed a three-month suspension for one instance of representing both parties in a real estate transaction in which the attorney had an interest in, which he failed to disclose to the client. 599 N.W.2d at 729–31. *Clauss* also involved a single instance of representing both parties in a loan without first obtaining informed consent, but we imposed a six-month suspension because of aggravating factors, including an extensive history of disciplinary infractions and the fact that Clauss personally beneficiated financially from the transaction. 711 N.W.2d at 4–5. Here, however, Hamer repeatedly and over the course of several years represented both parties in many loans. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Mendez*, 855 N.W.2d 156, 175 (Iowa 2014) (imposing suspension of sixty days for one conflict-of-interest violation, among other violations); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Qualley*, 828 N.W.2d 282, 288, 294 (Iowa 2013) (suspending attorney's license for

sixty days for one conflict-of-interest violation, along with other rule violations); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 606–07 (Iowa 2011) (suspending attorney for two years for a conflict-of-interest representation violation, along with a dizzying array of other violations, because attorney's conduct was "serious, egregious, and persistent" and harmed clients); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Zenor*, 707 N.W.2d 176, 187 (Iowa 2005) (suspending attorney for four months for engaging in criminal defense work while working as the county attorney); *see generally Stoller*, 879 N.W.2d at 219 (canvassing the caselaw and concluding a majority of sanctions imposed in conflict-of-interest cases range from suspensions of sixty days to a suspension of four months, depending on the egregiousness or number of violations).

That brings us to the question of double bonuses. Whatever confusion there may have been originally about the payment of a bonus, we think Hamer acted with deceit when he refused to give Paul an itemized statement disclosing the $110,000 bonus that was included in his billing for the Buckle Down sale. On top of the other nondisclosures, this is a troublesome violation. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bartley*, 860 N.W.2d 331, 338, 340 (Iowa 2015) (suspending license for six months for, among other things, a series of misrepresentations to law firm and to the court); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 459–60, 467 (Iowa 2014) (suspending attorney's license for six months for deceit persisting over a period of time involving forged proof of service); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Stein*, 586 N.W.2d 523, 526 (Iowa 1998) (neglecting client matters and making numerous misrepresentations to hide neglect warranted 180-day suspension).

Turning next to mitigating factors, Hamer does have an impressive record of community service. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Taylor*, 887 N.W.2d 369, 382 (Iowa 2016). Additionally, Hamer has never had any prior disciplinary action taken against him. *Bartley*, 860 N.W.2d at 339.

There are, however, a substantial number of aggravating factors. Hamer's lengthy career as a business attorney must be a strike against him, as well as his continued professed lack of understanding that the actions which he admits to doing clearly violated attorney ethics. *See id.*; *Comm. on Prof'l Ethics & Conduct v. Hall*, 463 N.W.2d 30, 36 (Iowa 1990) (finding that attorney's belief that nothing he did was really wrong in a conflict of interest representation is an aggravating factor). Additionally, Hamer committed numerous violations over a period of years, showing a pattern of misconduct. *See Cannon*, 821 N.W.2d at 883.

In short, Hamer displays an obviously cavalier attitude toward the requirements of our disciplinary rules. Because of the nature of Hamer's practice and the nature of his clients, the disclosure rules, according to Hamer, are somehow inapplicable, unnecessary, or optional. This is incorrect. The disclosure rules are always mandatory. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 143 (Iowa 2004) ("The disciplinary rules are mandatory provisions of our code of ethics . . . .").

Further, and despite Hamer's insistence to the contrary, Paul experienced at least some harm as a result of Hamer's conflicts of interest. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lynch*, 901 N.W.2d 501, 511 (Iowa 2017); *Iowa Supreme Court Bd. of Prof'l Ethics & Conduct v. Jay*, 606 N.W.2d 1, 4 (Iowa 2000). One of the loans is still outstanding and may in fact never be paid back.

There is no clear-cut formula for the determination of appropriate sanction in disciplinary cases. Based on the totality of circumstances, however, we think that a six-month suspension is required in this case.

## VII. Conclusion.

For the above reasons, we suspend Hamer's license for a period of six months from the date of this opinion without the possibility of reinstatement. The suspension applies to all facets of the practice of law, as provided by Iowa Court Rule 34.23(3), and requires Hamer to notify his clients, as provided by Iowa Court Rule 34.24. Upon any application for reinstatement, Hamer must establish that he has not practiced law during the suspension period and that he has complied with the requirements of Iowa Court Rule 34.25. The costs of this proceeding are assessed to Hamer pursuant to Iowa Court Rule 36.24(1).

**LICENSE SUSPENDED.**

All justices concur except Hecht, J., who takes no part.